**Case No. 25-3068**

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

## MICHAEL ERAVI,

*Plaintiff-Appellant,*

v.

## CITY COMMISSION OF LAWRENCE, KANSAS, *et al.*,

*Defendants-Appellees,*

---

On appeal from the United States District Court
for the District of Kansas
The Honorable Judge Daniel D. Crabtree
Case No. 24-cv-4042-DDC

---

## OPENING BRIEF OF APPELLANT

---

Linus L. Baker
6732 West 185th Terrace
Stilwell, Kansas 66085
(913) 486-3913
linusbaker@prodigy.net


*Attorney for Michael Eravi*
***Oral Argument is Requested***


May 1, 2025

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................................vii

STATEMENT OF RELATED APPEALS .................................................................viii

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................................... 5

STATEMENT OF THE ISSUES ............................................................................ 6

STATEMENT OF THE CASE .............................................................................. 7

THE COMPLAINT ALLEGATIONS ...................................................................... 7

MOTION TO DISMISS ORDER .......................................................................... 25

SUMMARY OF ARGUMENT ............................................................................. 27

STANDARD OF REVIEW ................................................................................. 29

ARGUMENT ................................................................................................. 30

    MCSHANE CANNOT PROVIDE CONTEMPORANEOUS FALSE INFORMATION
        TO HIS SUPERIORS TO JUSTIFY HIS CLAIM THAT MR. ERAVI WAS
        DISOBEYING HIM OR NOT LEAVING THE AREA WHICH THEN
        JUSTIFIES HIS PROBABLE CAUSE FOR AN INTERFERENCE ARREST ......... 30

    THE COMPLAINT DEMONSTRATES MR. ERAVI WAS IN COMPLIANCE WITH
        MCSHANE IN LEAVING THE AREA WHICH IS FATAL TO AN
        INTERFERENCE CRIME ............................................................... 37

    DEFENDANTS GAVE CONFLICTING REASONS FOR MR. ERAVI'S ARREST
        CLAIMING HE WAS ARRESTED BECAUSE HE DISOBEYED AN ORDER
        TO STOP AND DISOBEYED AN ORDER TO KEEP MOVING.
        DEFENDANTS REASON(S) FOR ARRESTING MR. ERAVI IS A JURY
        QUESTION ................................................................................ 39

A JURY COULD FIND THAT HIS PRESENCE ON THE APARTMENT PROPERTY WAS A
    PUBLIC FORUM, NOT A CRIME SCENE, THAT HIS FILMING OF POLICE WAS A

PROTECTED ACTIVITY, AND THAT HIS ARREST WAS RETALIATORY, AND THAT FORCE WAS USED ............................................................................ 43

CONCLUSION ................................................................................................ 49

ORAL ARGUMENT STATEMENT .................................................................... 52

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................................... 53

CERTIFICATE OF DIGITAL SUBMISSION ....................................................... 54

CERTIFICATE OF SERVICE ............................................................................ 55

Addendum ................................................................................................... 1

    COMPLAINT              5/17/2024 ................................... 1

    MEMORANDUM AND ORDER OF DISMISSAL    3/26/2025 ............................... 71

    FINAL JUDGMENT              3/26/2025 ............................105

# TABLE OF AUTHORITIES

**CASES**

*Blake v. Wallace,* No. 22-3163, 2024 WL 5087805 (10th Cir. Dec. 12, 2024) ......30

*Brandt v. City of Westminster,* 300 F. Supp. 3d 1259 (D. Colo. 2018)..................40

*Brown v. Kemp*, 2023 U.S. App. LEXIS 30112 (7th Cir. Nov. 13, 2023) .............48

*Buck v. City of Albuquerque*, No. 1:04-cv-01000-WJ-DJS, 2007 WL 9734037 (D.N.M. Apr. 11, 2007) ..................................................................................43

*Chaney-Snell v. Young*, 98 F.4th 699 (6th Cir. 2024)...............................................36

*City of Houston v. Hill*, 482 U.S. 451 (1987) ..........................................................42

*Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264 (10th Cir. 2023).....................31

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) ..............................................43

*Crowson v. Washington Cnty. Utah,* 983 F.3d 1166 (10th Cir. 2020) ...................47

*Douglass v. Garden City Cmty. Coll.,* 652 F. Supp. 3d 1329 (D. Kan. 2023) ........42

*Est. of Valverde ex rel. Padilla v. Dodge,* 967 F.3d 1049 (10th Cir. 2021) ...........34

*Fields v. City of Philadelphia,* 862 F.3d 353 (3rd Cir. 2017)..................................47

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) .......................................................36

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) .............................................34

*Fordyce v. City of Seattle,* 55 F.3d 436 (9th Cir. 1995) ..........................................47

*Freeman v. Gore*, 483 F.3d 404 (5th Cir. 2007)......................................................46

*Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011) ........................................................47

*Gorsky v. Guajardo,* No. 20-20084, 2023 WL 3690429 (5th Cir. 2023) ...............46

*Hartman v. Moore*, 547 U.S. 250 (2006)....................................................42

*Irizarry v. City & Cnty. of Denver*, 661 F. Supp. 3d 1073 (D. Colo. 2023)............43

*Irizarry v. Yehia,* 38 F.4th 1282 (10th Cir. 2022)....................................47

*Jojola v. Chaves*, 55 F.3d 488 (10th Cir. 1995)........................................31

*Jones v. City and County of Denver*, 854 F.2d 1206 (10th Cir. 1988)...................39

*Jordan v. Adams Cnty. Sheriff's Off.,* 73 F.4th 1162 (10th Cir. 2023)..................48

*Keating v. City of Miami,* 598 F.3d 753 (11th Cir. 2010)...............................40

*Manuel v. City of Joliet*, 580 U.S. 357 (2017).........................................38

*Merrill v. Fell,* No. 23-7018, 2023 WL 8827665 (10th Cir. Dec. 21, 2023)...........36

*Mink v. Knox,* 613 F.3d 995 (10th Cir. 2010)..........................................41

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012).......................................47

*Nicodemus v. City of South Bend, Indiana,* 711 F. Supp. 3d 1015
(N.D. Ind. 2024).......................................................................46

*Nieves v. Bartlett*, 587 U.S. 391(2019)...............................................42

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004)..................................38

*Poolaw v. Marcantel,* 565 F.3d 721 (10th Cir. 2009)...................................40

*Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008).....................................43

*Rosales v. Bradshaw*, 72 F.4th 1145 (10th Cir. 2023)..................................43

*Ross v. Willis*, 2021 WL 3500163 (S.D.N.Y. Aug. 9, 2021)..............................35

*Sanchez v. Guzman,* 105 F.4th 1285 (10th Cir. 2024)..................................29

*Sharpe v. Winterville Police Dept.,* 59 F.4th 674 (4th Cir.2023) ............................48

*Smith v. City of Cumming,* 212 F.3d 1332 (11th Cir.2000) ....................................47

*Spiehs v. Armbrister*, No. 24-4005-JAR-BGS, 2025 WL 548423 (D. Kan. Feb. 19, 2025) ................................................................................32

*State v. Jones,* 202 Kan. 31, 446 P.2d 851 (1968) ....................................................38

*State v. Merrifield,* 180 Kan. 267, 303 P.2d 155 (1956).........................................39

*Stonecipher v. Valles*, 759 F.3d 1134 (10th Cir. 2014) ...........................................39

*Turner v. Lotspeich,* 1996 WL 23195 (10th Cir. 1996)............................................42

*Turner v. Lt. Driver,* 848 F.3d 678, 688 (5th Cir. 2017) ........................................47

*United States v. Alaimalo,* 313 F.3d 1188 (9th Cir.2002) .......................................44

*United States v. Mendenhall*, 446 U.S. 544 (1980) .................................................46

*United States v. Sup. Ct. of N.M.,* 839 F.3d 888 (10th Cir. 2016) ..........................29

*Vette v. K-9 Unit Deputy Sanders,* 989 F.3d 1154 (10th Cir. 2021).......................30

*Waterhouse v. Direzza,* 129 F.4th 1212 (2025) ......................................................34

*Worrell v. Henry,* 219 F.3d 1197 (10th Cir. 2000) ..................................................41

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ..........................................................36

*Zorn v. City of Marion* No. 24-2044 2025 WL 949079 (D. Kan. Mar. 29, 2025) ..41

**Other Authorities**

Joe Hernandez, NPR, Read this Powerful Statement from Darnella Frazier, Who Filmed George Floyd's Murder, May 26, 2021, at https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnellafrazier-who-filmed-george-floyds-murd ...............................49

Lee, H. (1994) Crime Scene Investigation. Taoyan, Taiwan: Central Police
    University; USLegal, Crime Scene Law and Legal Definition'. [online]
    Available at: https://definitions.uslegal.com/c/crime-scene' ........................44

**CORPORATE DISCLOSURE STATEMENT**

Consistent with Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant

is not a corporation and that it neither issues stock nor has a parent  corporation

**STATEMENT OF RELATED APPEALS**

There are no related appeals.

**INTRODUCTION**

The Appellant is only appealing the dismissal of the claims against the individual defendants McShane, Shipley, Foster, and Twite.

The Appellant/ plaintiff Michael Eravi is a journalist publishing on "Lawrence Accountability" news stories about local law enforcement, government employee conduct, Lawrence Kansas City staff, and Douglas County Kansas prosecutors. Mr. Eravi was notified at approximately 10:40 p.m. on May 19, 2023, that police were called out to the 1900 block of Heatherwood Drive in Lawrence, Kansas, regarding Joshua Townsend, allegedly shooting at another neighbor.

The ariel view of the scene is depicted below:



1

There was no pedestrian perimeter or crime scene tape and no police vehicles blocking the streets or sidewalks when Mr. Eravi approached from the South. Mr. Eravi walked up towards the North alone from the bottom of the photo on the sidewalk on the right side of the street. The suspect's residence was located on the West side (left) of the street. Officers recognized Mr. Eravi by sight. He was not interfering with anything the police were doing across the street.

Mr. Eravi was filming the officer's position which was a distance of 50 yards (which was across the street from police presence) at the entry to an apartment building. While Mr. Eravi was filming he was approached by officer McShane who told Mr. Eravi confusing things such as he was a "free human being" and that McShane would "cover him." McShane said he wanted Eravi to "keep moving" which Mr. Eravi did. Mr. Eravi was arrested as he was traveling back South away from the Suspect's Residence. The snapshot of the AXON video clearly shows that Mr. Eravi was walking back towards his car away from the police presence when McShane falsely reported he couldn't get Mr. Eravi "to move" which triggered McShane's supervisor Shipley to direct Mr. Eravi's arrest. Add.35-38; AA41-44 (para. 145).



Mr. Eravi was acting in compliance and leaving when McShane falsely reported what is written in the AXON transcription at the 1:35 mark. The ariel below tracks where Mr. Eravi approached from the bottom green line and was then yellow. Mr. Eravi had walked to the edge of the apartment building shown in yellow and was attempting to leave and go back South away from the Suspect Residence in compliance with what McShane told Mr. Eravi to do:



McShane was falsely reporting to his supervisors in real time that "I can't get him to move" while another officer said McShane ordered Mr. Eravi "to stop." Mr. Eravi was moving back towards the South away from the suspect residence but because of the conflicting information Lieutenant Unruh told officers to "detain" Mr. Eravi while a lower ranking officer Seargent Shipley who was also hearing the misleading reporting told the officers to arrest Mr. Eravi not knowing Mr. Eravi was moving away from the police presence. Despite the allegations and the video snapshots taken from Mr. Eravi's cell phone both showing that Mr. Eravi was

4

complying with McShane's instructions and was moving back South away from the across the street crime scene the lower court held that Mr. Eravi "was moving to and fro in the middle of an ongoing crime scene with an active shooter." The district court did not explain how it concluded Mr. Eravi was "in the middle of an ongoing crime scene" being a distance of 50 yards away across the street. The district court held that "probable cause supported plaintiff's arrest because he ignored law enforcement instructions and distracted them by presenting additional safety concerns." The lower court held there was probable cause to arrest Mr. Eravi for felony interference with law enforcement and dismissed all of Mr. Eravi's 1983 civil rights claims. This appeal follows.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment on March 26, 2025, and Michael Eravi timely filed his appeal notice on April 21, 2025. AA 1-197.[1]

---

[1] "AA#" denotes the page(s) in Appellant's Appendix which contains one volume.

The issues presented are:

1. **There was no "crime scene" established by police 50 yards away across the street where Mr. Eravi was filming police from the front door of an apartment complex. The lower court held this area was "the crime scene" and held Mr. Eravi could not film police from that location which justified police arresting him for felony interference with law enforcement?** Was this error?

2. **The defendant officers provided their superiors false and misleading real time information about what Mr. Eravi was doing at the apartment complex across the street before he was arrested. Some officers said Mr. Eravi was told to stop while Officer McShane said the opposite – he couldn't get Mr. Eravi to move. Can probable cause to arrest Mr. Eravi by Officer McShane exist based upon false information provided to his superiors by Officer McShane?** The lower court held McShane had probable cause to arrest Mr. Eravi. Was this error?

3. **Mr. Eravi was complying with the statements given him by Officer McShane and was traveling away from the Suspect Residence even though McShane falsely reported Mr. Eravi was not leaving the area and not complying with his statements.** Could a jury reasonably believe that Mr. Eravi was in compliance with the officer instructions being 50 yards away from the officers and while he was retreating back South away from the residence in compliance with those instructions and therefore was not interfering with police duties by obeying police commands? The lower did not give credence to the allegations of the Complaint and took at face value the statements of the Officers. Was this error?

4. **Did the Defendants have a duty to ensure the safety of Mr. Eravi while in front of the apartment complex and if so that his continued presence interfered with that duty giving rise to a felony arrest for interference with police duties?** The District Court held that there was such a duty and that Mr. Eravi interfered with that duty giving rise to probable cause to arrest him. Was this error?

5.  **Did the Lower Court err in dismissing Mr. Eravi's claims against the individual defendants that his arrest was retaliatory, that they used force in the false arrest, and failed to intervene?**

THE COMPLAINT ALLEGATIONS

On May 19, 2023, Mr. Eravi was filming police 50 yards from their position while across the street in front of an apartment complex in Lawrence, Kansas. Add.19-20; AA25-26.  When Mr. Eravi entered the block there was no police presence or barriers impeding pedestrians from walking up the sidewalk on either side of the street.  Add.17-18; AA23-24.  Mr. Eravi has worked in cooperation with other media outlets and journalists to record and provide media coverage of issues relating to government corruption and police use of force, to include members of The Lawrence Times.   https://www.aol.com/gladstone-hired-cop-left-op-191909437.html.  Add.10; AA16.  The media coverage afforded by Mr. Eravi is generally negative, focusing on issues related to misconduct and corruption by government officials and state agents, with an archive of reporting going back at least three years. Add.10; AA16.   The Lawrence Police Department and the Prosecutor's Office have frequently been the focus of Mr. Eravi's reporting, as well as officials in local city government. Mr. Eravi's videos have each been viewed thousands of times or more. Add.10; AA16.  The Complaint alleged:

48. This incident occurred in the context of a law enforcement response to a shoot-out that started May 19, 2023, between neighbors; a subsequent active shooter situation; and an undefined /unsecured crime scene.

49. This incident also occurred in the context of a history of highly publicized negative agency media coverage as a citizen journalist by the plaintiff Phillip Michael Eravi.

50. It also occurred in the context of a prior complaint of excessive force by Mr. Eravi, against defendant Twite. Defendant Twite was one of the officers who participated in the arrest of Mr. Eravi as alleged in this Complaint.

51. Prior to his arrest in the early morning hours of May 20, 2023, Mr. Eravi had multiple negative interactions with the defendants and other Officers of the Lawrence Police Department, documented on both his YouTube channel and by the local media.

52. Prior to his arrest on May 20, 2023, Mr. Eravi had filed a complaint against defendant Twite, one of the arresting officers at the scene, for excessive force.

53. At the scene of Mr. Eravi's arrest, he was recognized by appearance by defendants and other officers, and was referred to as "Mike" by one or more of the defendants.

54. On May 19, 2023, at approximately 10:37 p.m., the defendants responded to a reported shoot-out between neighbors in the 1900 block of Heatherwood Drive. This is a populated residential neighborhood, characterized by homes, an apartment complex, and related vehicle and pedestrian traffic.

55. Upon arrival, defendants determined that one person was injured and rendered aid. They immediately came to believe that an armed shooter was inside of the home at 1951 Heatherwood Drive.

56. The Lawrence PD Critical Response Team (CRT) was deployed in response to their belief that an armed man was inside of the home at 1951 Heatherwood Drive. Using an armored vehicle and communicating with a loudspeaker from his driveway, the CRT tried to persuade the suspect Joshua Townsend to give himself up.

57. Officers did not receive a reply. After waiting several hours, law enforcement entered this residence and apprehended Joshua Townsend, identified as the shooter, who was indeed armed.

58. As reported by City Officer Adam Welch: he "was briefed that the suspect, Joshua Townsend DOB [ ] was inside the residence of 1951 Heatherwood Drive, refusing to exit and was armed with a handgun and, who had earlier in the evening fired, several rounds at his neighbor who resided at 1943 Heatherwood Drive. R/O was also told Townsend had access to an AR-15 type rifle."

59. Officer Welch stated "R/O's main duty was to provide cover to all officers on the scene from the turret position of the armored vehicle, which was parked in the driveway of 1951 Heatherwood Drive, facing the opened garage door. R/O noted the interior door leading into the residence, from the garage was opened allowing

R/O to view a few feet into the interior of 1951 Heatherwood Drive. Based on the information provided to R/O it was paramount that the opened garage door be covered at all times."

Add.11-12; AA17-18.

The Complaint alleged:

65. There is an abundance of video evidence in this case to permit a jury to infer that the defendants used force after Mr. Eravi had already begun to comply with the defendants vague and confusing statements. If anything, the plethora of video evidence show that Mr. Eravi was told confusing and contradictory statements throughout. On the night and morning in question, Mr. Eravi's presence as a citizen journalist immediately adjacent to apartment buildings across the street one-half football field length from a suspect's residence posed no threat to police.

66. In fact, Mr. Eravi was apparently arrested because he, according to the defendants, somehow posed a safety threat to himself by filming police and the area – and this because police continuously spotlighted him and created the very circumstance that drew attention to Mr. Eravi.

Add.14-15; AA20-21. The Complaint stated:

82, Mr. Eravi was out walking in an unmarked, un-perimeter, public place at the time. There was no so-called perimeter established by the Lawrence Police Department.

83. There were no officers present in the police vehicle on the South side from which Mr. Eravi approached, and no officers were present to instruct anyone from walking from the Southside Northward.

84. Mr. Eravi walked up to the unoccupied patrol car to ascertain what was happening. But the computer screen was blank.



85. Despite later claiming that the "officers were tasked with keeping citizens away from the immediate location for their own safety" there was no crime scene tape placed, nor was any visible, tangible, perimeter ever established at the scene by officers, other than the armored vehicle parked in the driveway of 1951 Heatherwood Drive.

86. Police did not provide any notice to the public or do anything, prior to Mr. Eravi's encounter, that indicated that foot traffic was not permitted where Mr. Eravi was walking.

Add.17-18; AA23-24.  The Complaint stated:

87. An ariel view of the area is below:



88. The ariel describes the location of the initial exchange of gunfire and Joshua Townsend's residence. A police car blocked entry onto Heatherwood Drive but did not block pedestrian traffic on the East side sidewalk.



89. There was no pedestrian perimeter where Mr. Eravi was because defendants had not specifically contemplated pedestrian traffic adjacent to the apartment.

90. Not only was there no perimeter, it was the officers located at the Suspect's Residence that saw Mr. Eravi approach from the South. The responding officer McShane was located farther North on the street where the Initial Exchange of Gunfire is located on the map.



91. The ariel also depicts the approximate distance of 150 feet from where Mr. Eravi was confronted by Lawrence police. Mr. Eravi has been on numerous scenes, whether described as a crime scene, which is similar to this area and circumstance.

92. In those prior occasions where Mr. Eravi was present at a scene, he was not harassed, detained or arrested by police. Lawrence police officers know Mr. Eravi by sight, who he is, and what he does to attempt to help the community.

Add.19-20; AA25-26.

The Complaint further alleged that:

97. At 1:43 a.m. Lieutenant Mark Unruh instructed two officers to suggest people in the apartment across the street "shelter in place" or leave – but did not require the officers to order either of those two suggestions:

Unruh "Anybody that's in direct line with that, can you just knock on the door and let them know, Hey, we got an incident going on. We're worried about the potential of gunfire. We would advise that you probably leave for the night. And that they need to leave out that way and then go all the way down. But if they're

going to shelter in place, then they're going to shelter in place. Can you do that for me?"

98. Defendant Shipley reported that the armored vehicle was used "to protect people from bullets." Another Lawrence officer, Seargent Ashley, called out on the PA system for Mr. Townsend to exit the residence.

99. Major Hayden Fowler was the highest ranking officer at the scene who knew who Mr. Eravi was by sight. Fowler was familiar with Mr. Eravi as being often present and reporting on police incidents. Fowler informed the officers that it was Mr. Eravi. Fowler saw Mr. Eravi walking northbound and was able, and did, observe all of the walking movements of Mr. Eravi.

100. According to her report, at approximately 1:53 a.m. on May 20, 2023, defendant Shipley saw a subject whom she recognized as Mr. Eravi walking northbound in the 2000 block of Heatherwood Drive on the east side of the sidewalk holding his phone recording which is opposite from the side where she was behind the armored vehicle parked in the Townsend's driveway. Defendant Shipley was able to and did observe all of the movements of Mr. Eravi.

101. The below graphic shows in green where Mr. Eravi was walking. It turns to yellow where Mr. Eravi is spotlighted by defendant McShane. The red dot is the point that defendant McShane first makes physical contact with Mr. Eravi. The blue line indicates the Douglas County Sheriff's office vehicle arriving with CRT members inside, as McShane and Foster were grabbing Mr. Eravi and joined in as he moved South. The CRT members were already walking South when Mr. Eravi was at the top on the red line. but that did not occur until after Mr. Eravi was arrested which is indicated at the top of the red line.



102. Defendant Shipley was able to, and did in fact, personally observe all of Mr. Eravi's walking movement in front of the apartment that late evening and early morning. Defendant Shipley had no need to rely upon Defendant McShane's descriptions of Mr. Eravi "not moving" when Defendant Shipley personally witnessed that Mr. Eravi was moving and in fact moving back South parallel close to the apartment complex's private property. at the time when she made her order to arrest Mr. Eravi.

Add.22-23; AA28-29. The Complaint alleged:

109. At the red dot, defendant McShane makes physical contact with Mr. Eravi.



110. Both officers approached, one looks away, and defendant McShane has his right hand positioned:



111. Mr. Eravi attempted to put distance between himself and the defendant McShane walking East towards the apartments as indicated by the yellow line. Mr. Eravi then headed North parallel close to the apartment building and then turns around and heads South depicted in the graphic. As Mr. Eravi was walking away

from the Suspect Residence McShane has misrepresented to his supervisor defendant Shipley that Mr. Eravi is "not moving" and is in front of the police armored vehicle located at the Suspect Residence. The dialogue from the red dot where defendant McShane physically contacted Mr. Eravi till was walking back South to the beginning of the red line was as follows:

| | | |
|---|---|---|
| Eravi | (01:04): | Don't touch me. |
| McShane | (01:05): | If you want to walk, walk. But I have to cover you. Let's go. |
| Eravi | (01:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (01:16): | You live here? |
| Eravi | (01:16): | You need to leave me alone. |
| McShane | (01:19): | Come on. Just get inside if you live here. |
| Eravi | (01:20): | You need to leave me alone. |
| McShane | (01:21): | Sir, I need you to leave. |
| Eravi | (01:23): | You need to leave me alone. |
| McShane | (01:24): | I will. Just keep walking. |
| Eravi | (01:27): | I'm a free human being. You need to leave me alone. |
| McShane | (01:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (01:30): | Leave me alone. |
| McShane | (01:30): | I'll walk with you. |
| Eravi | (01:31): | Leave me alone. |
| McShane | (01:34): | I can't get him to move. |
| Eravi | (01:37): | You motherfuckers woke me up. Leave me alone. You woke me up. |
| McShane | (01:39): | What's your name? |
| Eravi | (01:40): | You woke me up. You got me out here. Leave me alone. |
| McShane | (01:42): | Okay. Come on. |
| Eravi | (01:43): | Get off me, dude. |

Add.28-29; AA34-35.

The Complaint alleged:

113. Defendant Twite reported that "Officer McShane and Officer Foster approached" Mr. Eravi. Defendant Twite falsely reported that both were speaking with Mr. Eravi when only one officer had. Defendant Twite falsely reported that both ("they") said Mr. Eravi "was not complying with commands" when no commands had been given to Mr. Eravi by either. In his report, defendant Twite falsely reported that both reported to "dispatch" claiming Mr. Eravi was not complying with commands when the actual verbiage was "I can't get him to move."

114. Mr. Eravi walks North to the end of the apartment building where a police vehicle is parked with no lights and no emergency lights.



115. In defendant Foster's report he claimed that "Officer McShane ordered [Mr. Eravi] to stop" while nothing spoken by defendant McShane after that initial confrontation and prior to the arrest, could be reasonably understood as an ongoing command to Mr. Eravi to stop walking.

116. As Mr. Eravi walked back to the South he looked over at the individuals at the armed vehicle:



117. In defendant Shipley's report, she stated that "I informed Officer McShane that Eravi could not stand behind the armor" and that defendant McShane stated

Mr. Eravi "was not listening." Defendant Shipley then stated she told defendant McShane to arrest Mr. Eravi.

118. Mr. Eravi turned around and headed back South and another unlit parked police vehicle was located on the other side of the street:



119. But the joint communications involving Lieutenant Mark Unruh, defendant McShane, and defendant Shipley indicate that Lieutenant Unruh said to "detain" and not arrest Mr. Eravi according to Unruh's body cam video:

UNRUH: Yeah, we got units going down there to make contact.

SHIPLEY: Okay, he's continuing to come closer.

UNRUH: Yep, we got guys right there walking towards him. I don't know if that's our subject or not.

SHIPLEY: He can't be right behind the armor.

MCSHANE: I can't get him to move.

SHIPLEY: ..Just arrest him

UNRUH: Go ahead and detain him.

*** 

UNRUH: The team is showing up.. What the fuck was that over there?

GROSS: I didn't see who it was, I think it might have been Eravi

PATE: It was Eravi [inaudible 02:56:18].

120. Defendant Shipley later testified she did not hear her superior Lt. Unruh say to detain Mr. Eravi and further testified that even if she had heard this command she would have overridden Lt. Unruh's detain command.

Add.29-32; AA35-38. The Complaint alleged:

121. Despite being told by Lt. Unruh to merely detain Mr. Eravi, defendant McShane ignored that command and arrested Mr. Eravi.

122. Defendant McShane falsely claimed in his report that he told Mr. Eravi he could "continue walking through to the north" and then characterized the area not as dangerous but merely a "potential dangerous areas."

123. Sgt. Shipley and Officer McShane both made reports that "neighboring residents had been evacuated or told to shelter in place due to danger to the public" although this was not true if "told" means commanded as the statements were merely suggestions and none of the police body cams substantiate those claims.

124. At no time was Mr. Eravi advised by any Lawrence police officer that he was in danger, in a crime scene perimeter, that police were attempting process of service, or that there was any likelihood of shots being fired.

125. Defendant McShane's body cam footage that was provided to Mr. Eravi was only eight minutes and 35 seconds which appears to be incomplete.

126. Defendant McShane told Mr. Eravi he could walk and to just keep walking, but that McShane would assure Mr. Eravi's police protection and safety -- McShane would act as Mr. Eravi's protective shepherd (i.e. "cover him") indicating Mr. Eravi was still free to walk and would be escorted and always protected by that officer.

Add.33; AA39.

The Complaint further stated:

132. Defendants admitted that Mr. Eravi was told that "he was free to walk through the area" – despite purportedly later claiming (and did not say to Mr. Eravi) that doing so would place Mr. Eravi "in the line of fire" and placed Mr. Eravi "in harm's way." Defendants also later claimed that Mr. Eravi was free to walk as long as he would be "covered by an officer if he wanted to do so" and then claimed Mr. Eravi was told he "could not linger in the immediate vicinity."

133. Defendants admitted that Mr. Eravi "was free to remain in the general area" yet arrested him for being in the general area.

134. Mr. Eravi was not in the immediate vicinity of an armed standoff being where he was located.

135. Defendant McShane never told Mr. Eravi of a specific location where he "could linger."

136. Mr. Eravi never prevented any of the defendant officers from performing their official duties related to the 1951 Heatherwood Drive location at that time.

137. Mr. Eravi told defendant McShane he did not need to be covered. Defendant McShane then told Mr. Eravi he needed to leave, but never told him why, or that he was in any perimeter, crime scene, or that he was in any danger.

138. Mr. Eravi told defendant McShane that he was a free human being and defendant McShane agreed with him. Mr. Eravi reasonably believed that defendant McShane was communicating to him that Mr. Eravi was free to be where he was and was free to walk with his telephone.

139. Defendant McShane then falsely reported to other officers that he "can't get him to move" but Mr. Eravi was continuously moving.



140. Defendant McShane reported that Mr. Eravi was moving: "ignored my commands and continued to walk." Yet, defendant McShane later said to "just keep walking" so which statement was Mr. Eravi supposedly not complying with?

141. In fact, Mr. Eravi was moving away from defendant McShane and was, at the time, walking South further away from 2000 Heatherwood from where McShane originally confronted Mr. Eravi.

142. Defendant McShane reported to the command post that Mr. Eravi was located in front of 1925 Heatherwood Drive as though Mr. Eravi was near when in fact he was across the street some 150 feet away in front of apartment buildings across the street from the Suspect Residence.

143. Defendants falsely claimed that Mr. Eravi "refused to comply" with defendant McShane's "order to evacuate the immediate vicinity."

144. According to the defendant Shipley, Mr. Eravi was arrested because he stood behind the armor or for not listening. Defendant Shipley stated in a report that "I informed Officer McShane that Eravi could not stand behind the armor. Officer McShane advised Eravi was not listening. I informed Officer McShane to arrest Eravi."

145. Even as defendant McShane was again falsely reporting to defendant Shipley that he "can't get him to move" Mr. Eravi had constantly been moving and was in fact walking South making no movements towards the Suspect Residence:



146. Mr. Eravi continues to walk South making no movements towards the Suspect Residence followed by defendant McShane. It also demonstrates defendant McShane continued to light himself up as well as another officer standing out in the open:



147. Despite walking back South defendant McShane does not inform defendant Shipley of Mr. Eravi's continual movement and particularly his movement South. Based upon the false, misleading, and incomplete information from defendant McShane to defendant Seargent Meagan Shipley, defendant Shipley instructed defendant McShane to arrest Mr. Eravi as Mr. Eravi was walking South.

148. Defendants falsely claimed that Mr. Eravi "attempted to walk directly across from the residence."

Add.35-38; AA41-44.

The lower court summarized its view of the facts stating the officers "allegedly couldn't get him to stop moving near the suspected shooter's residence. And so, the officers arrested him for interference with law enforcement." Add.71; AA162. Yet the Complaint alleges the officers were giving inconsistent reporting of what was said and was in fact complaining of the opposite: that they couldn't get Mr. Eravi "to move":

16. Major Fowler stated that defendant McShane "announced via the radio that Eravi was refusing to leave the area" which was untrue as McShane made no such orders and his radio message did not claim that.

18. Defendant McShane falsely stated in his report Mr. Eravi "seemed to want [to] meander directly behind the tactical team" when in fact Mr. Eravi was walking away back South away from the tactical team prior to the arrest decision. McShane falsely claimed that "I aired that Phillip would not leave the area" when in fact what he said was I "can't get him to move" which was also false.

19. Defendant McShane then reported that other officers were sent by defendant Shipley, not because Mr. Eravi was interfering with law enforcement activity, but instead "to assist moving Phillip out of harm's way."

21. Yet in Foster's incident report given after the arrest he pre-textually claimed other justifications for the arrest: "behavior proved distracting to officers working the scene; "Phillip's refusal to leave the area;" "McShane ordered Phillip to stop, but Phillip did follow Officer McShane's commands; "Phillip move back and forth and try to away from Officer McShane, and continue to ignore commands." Add.5-6; AA11-12:

The Complaint pled that "this Complaint will show visual evidence taken from various body worn cameras that show Mr. Eravi was in a public forum, on private property, wanted to be left alone, continuing to walk casually, neither stopping nor breaking into a run that early morning. Mr. Eravi was merely carrying his phone which was recording. He did not carry any weapon of any kind." Add.2;AA8. It was pled that "Defendant City Officer McShane undertook his initial stop of Mr. Eravi on this private property without reasonable suspicion, and nothing during the stop created even arguable probable cause to arrest him for any offense under Kansas law. Mr. Eravi was not trespassing. There had been no complaints by the apartment owner(s) as to Mr. Eravi's presence on the front yard of an apartment complex property." Add.2;AA8. It was pled that the "reports were falsified to cause

and support Mr. Eravi's prosecution. Mr. Eravi was charged under K.S.A. 21-5904(a)(3) & (b)(5)(A) as "unlawfully, feloniously, and knowingly obstruct, resist, or oppose a person authorized by law to serve process, to-wit: David McShane and/or other Lawrence Police Officers, in the discharge of any official duty, in the case of a felony, a severity level 9 nonperson felony." Add.3;AA9.

Mr. Eravi's Complaint alleged:

11. Numerous reports of the Officers and defendants claim or connect the need to arrest Mr. Eravi so that Mr. Eravi would be "out of harm's way" or that Mr. Eravi "distracted" or drew their "attention" to Mr. Eravi. Defendant Twite falsely claimed to dispatch "that Phillip was not complying with commands" which was recited in Twite's incident report. Officer Welch falsely reported as fact in his report that Mr. Eravi "had walked past perimeter patrol vehicles and was in an active crime scene. Eravi was then approached by officers of the Lawrence Police Department and ordered to leave. Eravi refused to leave…."

Add.4;AA10.

12. Officer Pate reported in his incident report that "officers approached him to make contact with him to direct him to leave the area as it was not safe" and that it "appeared the male was not cooperating with officers." Pate stated his "attention was divided."

13. Defendant McShane stated in his incident report that he "commanded him to stop" and that Mr. Eravi "ignored my commands and continued to walk." McShane claimed that "it was clear that several tactical officers were distracted and interfered with by Phillip's actions." McShane claimed that he "offered several options for Phillip to leave the area but he refused to do." Defendant McShane may have only made suggestions but never gave any commands to Mr. Eravi prior to the decision to arrest him.

14. Major Fowler stated in his incident report that "there were marked LPD cars at multiple street locations, blocking access to the area where the suspect home was located, to keep people from entering" but this was not entirely true. These LPD cars were parked at some intersections blocking car traffic in certain ways, none of the LPD cars blocked any access to pedestrian traffic."

Add.4;AA10.

**MOTION TO DISMISS ORDER**

The district court entered an order March 26, 2025, granting all of the defendants motion to dismiss. The lower court acknowledged that McShane followed Mr. Eravi "vaguely herding to an unknown destination." AA166. The district court specifically acknowledged that Mr. Eravi "was walking south" away from the Suspect Residence when McShane was contemporaneously telling his superiors that he "can't get him to move." AA167. The lower court held that probable cause to arrest Mr. Eravi for interference with official duties was two-fold: that there was "disobedience" and "hindering an officer with safety concerns." AA174. In addressing the allegations of the Complaint alleging that McShane's statements were ambiguous and were not commands, the lower court relied solely upon the "dialogue" holding that "McShane made at least two imperative statements to plaintiff": "Just get inside if you live here" and "Sir, I need you to leave." AA174. The lower court gave favorable inferences to McShane's statements: that McShane's "alleged permission to walk and promise to cover, in context, are akin to commands as well." AA174. The lower court concluded that the gist of McShane's statements were for "plaintiff to walk or keep walking" and that McShane wanted "to clear plaintiff out of that space." AA175. The lower court concluded that "McShane's inability to get plaintiff to move led to plaintiff's arrest." AA175. "Immediately after McShane identified his inability to clear plaintiff out of the area, superior

officers instructed McShane to arrest or detain him." AA175. "Plaintiff's physical presence near the armored vehicle and McShane's inability to get him to clear out of the area led to plaintiff's arrest." The lower court concluded that "plaintiff didn't film the officers from a comfortable remove." AA176. The district court concluded that "McShane gave lawful orders, attempting to remove plaintiff from the area because he was interfering with police officers' efforts to perform their duties." "Plaintiff didn't comply" and therefore the district court held that Mr. Eravi's "disobedience provides probable cause to arrest plaintiff for interference." AA176. The lower court held McShane had probable cause "based upon the information possessed" by McShane. AA177. The lower court disregarded the after-the-fact reasons given by officers for the arrest relying solely on the officers' "contemporaneous" statements. AA176. In fact, the charge against Mr. Eravi was not anything the lower court recited but instead had to do with obstructing "to serve process." AA58. The lower court dismissed claims against the City holding its recording policy was reasonable and that there was no causal connection of the policy to the arrest. AA191. The lower court determined that alleging that other individuals who were in similar across the street proximity were not arrested was not specific enough. AA192.

The conduct Mr. Eravi was charged with concerning officers official duty of serving process. AA58. There was no "official duty" cited in the charges such as ensuring the safety of Mr. Eravi or purportedly "clearing an area." Yet the lower court eschewed the actual reason cited in the charging papers and substituted its own reasons for the arrest. The lower court also never explains why the police suggestive (but not imperative) shelter-in-place situation still created an imperative that no individual could stand in front of the apartment building's front door filming police. Equally important is the precise moment it was determined by Sgt. Shipley to arrest Mr. Eravi: when he was, in fact, leaving south away from the Suspect Residence, based upon McShane's false contemporaneous statements that Mr. Eravi was not "moving" – i.e. leaving. The AXON footage at the precise time McShane reports Mr. Eravi disobeying him (not moving) explicitly shows Mr. Eravi obeying McShane with his back and hands in pockets walking away from McShane headed south next to the apartment complex leaving the area. The lower court ignored this moment which was compliance. The lower court deemed the radius of 50 yards from the Suspect Residence to be an all-encompassing "crime scene" without analyzing why that was so. The lower court then focused exclusively on the "dialogue" holding that everything said was the Gospel truth despite the snapshot depictions. Mr. Eravi was clearly complying leaving and it cannot follow that Mr.

Eravi's compliance in leaving did not constitute "McShane's inability to get him to clear out of the area." AA175. Vaguely referencing "the area" and the lower court's taking McShane's statements as truth – the polestar determination, the lower court determined Mr. Eravi was disobeying commands of the police while in a crime scene. Literally ignoring all of the visual depictions and allegations contained in the Complaint, the lower court concluded that Mr. Eravi was in the crime scene citing just to paragraph 111. But paragraph 111 says McShane "misrepresented to his superior supervisor defendant Shipley that Mr. Eravi is 'not moving' and is in front of the police armored vehicle located at the Suspect Residence." AA34. So paragraph 111 says precisely the opposite of what the lower court declared. Mr. Eravi was never in the crime scene at the 1951 Heatherwood Drive location. Mr. Eravi did not breach any crime scene tape or any boundaries that could have – but were not – set up that late night. Mr. Eravi simply walked up the sidewalk on the other side of the street in which other people were entering and exiting that apartment building. Police knew who Mr. Eravi was and he was filming their activity at that address across the street literally on the front door steps of the apartment complex across the street at about a 150 feet of distance from that residence. Mr. Eravi was on private property open to the public, he was not trespassing, and did nothing to interfere with police activities across the street. The district court viewed the Complaint facts as though this were a bench trial.

The lower court never addressed the video snapshots as well as the conflicting and false information provided to Seargent Shipley which led to her order to arrest Mr. Eravi. The lower court never addressed how the apartment complex across the street was a legitimate "crime scene" or how Mr. Eravi's filming of their activities across the street next to the Apartment could have possibly interfered with any of the officer's duties. The Complaint allegations were replete with factual and plausible allegations that officer McShane gave confusing statements – whether orders or suggestions – and the fact that Mr. Eravi was putting more distance between himself and the suspect residence across the street when the order to arrest him was given. The lower court never gave any meaning to what was pled and described in the video snapshots instead only focusing on a dialogue without that context.

### STANDARD OF REVIEW

This Court reviews First Amendment claims and Motion to Dismiss rulings de novo. *Sanchez v. Guzman,* 105 F.4th 1285, 1292 (10th Cir. 2024). A lower court is required to take all of the plausible allegations as true and then draw all reasonable inferences in favor of the plaintiff. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 898 (10th Cir. 2016).

**MCSHANE CANNOT PROVIDE CONTEMPORANEOUS FALSE INFORMATION TO HIS SUPERIORS TO JUSTIFY HIS CLAIM THAT MR. ERAVI WAS DISOBEYING HIM OR NOT LEAVING THE AREA WHICH THEN JUSTIFIES HIS PROBABLE CAUSE FOR AN INTERFERENCE ARREST**

The snapshots from the videos should have been considered by the lower court but were not. They should have been viewed with favorability to the plaintiff unless the snapshots or video "blatantly contradicts" the plaintiff's recitation of facts. *Blake v. Wallace,* No. 22-3163, 2024 WL 5087805, at *2 (10th Cir. Dec. 12, 2024) The blatant-contradiction standard is "a very difficult one to satisfy." *Vette v. K-9 Unit Deputy Sanders,* 989 F.3d 1154, 1167 (10th Cir. 2021). Irrespective of the lower court's reliance on the recited "dialogue" the crucial AXON video snapshot at the 1:35 mark shows Mr. Eravi walking south away from the Suspect Residence in compliance with McShane's wishes when McShane falsely reports that "I can't get him to move." Ignoring the snapshots, the "light" the lower court employed to interpret the Complaint was skewed by a rhetorical device the district court employed. The district court employed an odd nomenclature in evaluating the allegations about McShane's thought processes and motives contained in the Complaint called "context" – as though the lower court were interpreting the words in McShane's dialogue as statutory language. The lower court stated "McShane's alleged permission to walk and promise of cover, in context, are akin to commands as well – intended to accomplish the same purpose as the imperative statements –

removal." AA174. But the "in context" nomenclature is not a free pass for the lower court to impute mind-reading and its interpretations and motivations of McShane by judicial fiat. This "in context" light is only suited in a bench trial rather than evaluating words and favorable inferences contained in a Complaint. But the lower court employed the "context" device again stating "McShane repeatedly instructions plaintiff to walk or keep walking. In context, however, plaintiff's pleading makes clear that the officer didn't permit plaintiff to wander around the active shooter area or remain in proximity to the suspected shooter's residence." AA175. But that is what the Complaint demonstrated if motives and mindreading were not employed by the lower court about what McShane was doing or meant to do. This Complaint contained "four corners" and not just dialogue. It should be evaluated as a whole. *See Jojola v. Chaves*, 55 F.3d 488, 494 (10th Cir. 1995); *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264, 1277 (10th Cir. 2023) ("complaint taken as a whole"). The Complaint repeatedly asserts that McShane's statements were unclear, not imperatives, and that McShane was actually telling Mr. Eravi he was free to film while McShane acted as his escort. The lower court improperly put itself into the mind of McShane interpreting his statements and actions utilizing solely the dialogue described in the Complaint. But if "context" did matter, why didn't the lower court consider the photo depiction of Mr. Eravi leaving to the south when

McShane gave his false report that "I can't get him to move? That context also matters which the lower court entirely ignored.

The lower court glossed over the contemporaneous statements of McShane putting them instead in a box called "false reports." But the lower court missed the point: there is no distinction in an officer providing after the fact false information to support a probable cause affidavit than in doing so orally to one's superiors in real time. The lower court did not analyze the contemporaneous real time statements that were made which were false. Had McShane told the truth at the moment he said "I can't get him to move" instead saying "Eravi is moving south away from us" Sgt. Shipley would not have ordered an arrest. As the lower court cited *Spiehs v. Armbrister*, No. 24-4005-JAR-BGS, 2025 WL 548423 (D. Kan. Feb. 19, 2025) and Judge Robinson's analysis is correct: "a prudent person would not believe that Plaintiff had committed—even arguably committed—[service interference], and thus [McShane] did not have arguable probable cause to arrest Plaintiff for that offense."

And the arrest decision maker was Sgt. Shipley who one must guess what crime she thought was committed – if the post hac reports don't mean anything as the lower court held. The lower court relied almost exclusively on the dialogue yet that dialogue from the decision maker Shipley contained no stated reason for the arrest. So how did the lower court presume to know why Shipley made the decision

to arrest Mr. Eravi and for what crime?   So there is no statement in contemporaneous "dialogue" that indicates what crime Sgt. Shipley thought Mr. Eravi had committed when she ordered McShane to arrest Mr. Eravi.  In fact, in that dialogue it appears Mr. Eravi was arrested, not for a crime, but because of some community care concerns.

> Shipley:    He can't be right behind the armor.
> McShane: I can't get him to move.
> Shipley: ..Just arrest him

AA38.  Being "behind the armor" 50 yards away across the street is quite an imposed zone of no civilian presence.  Sgt. Shipley never said Mr. Eravi was in the crime scene or contaminating evidence.  But the one person who provided an opinion for the arrest reason was Fowler who said it was for "interference."   But even then Fowler gave a different reason.   Based upon the false information McShane provided, Fowler told Mr. Eravi that "for your safety we wanted to move you" and that "you refused to move." AA48.  When Mr. Eravi said "so all of this is about my safety" Fowler said "It is about your safety."

When the individual officers used force on Mr. Eravi as he walked south away from the Suspect Residence, they were not doing an investigative stop.   Their contemporaneous opinions about the justification for the arrest does not come from the decision maker Sgt. Shipley.   Rather, it is merely their opinions as they are acting under the order of Sgt. Shipley yet can plainly see that Mr. Eravi is complying with

McShane's wishes in leaving. According to Fowler, Mr. Eravi is under arrest and the only justification for use of force is Mr. Eravi's safety. Putting aside Mr. Eravi's purported safety, officer safety has its own analysis. This Court considers "officer safety concerns and whether the suspect cooperates or resists." *Cortez* at 1128. Thus the only relevant factor was safety – whether Mr. Eravi "poses an immediate threat to the safety of officers." This factor "is undoubtedly the most important factor in determining the objective reasonableness of an officer's use of force." *Est. of Valverde ex rel. Padilla v. Dodge,* 967 F.3d 1049, 1060-61 (10th Cir. 2021). And to that factor a jury could readily find Mr. Eravi posed no such safety threat at all. When a "suspect is unarmed we should consider (although not exclusively) the evidence indicating whether or not the suspect (1) was exhibiting compliance or hostility toward the authority of the officers, (2) was exhibiting a willingness to use violence against the officers or others, and (3) was capable of causing and in a position to cause imminent severe bodily harm." *Waterhouse v. Direzza,* 129 F.4th 1212, 1223 (2025).[2]

All of the individual defendants participated in the arrest and force. All were "acting as a team." *Lee v. Town of Estes Park, Colo.*, 820 F.2d 1112, 1115 (10th Cir.

---

[2] In assessing any threat Mr. Eravi posed the Court considers: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Cortez* at 1260.

1987).  It would be an odd circumstance in which McShane is claiming he can't get

Mr. Eravi to move yet claim he is fleeing arrest.  See *Vette at* 1169 ("fleeing or

actively resisting at the precise moment the officer employed the challenged use of

force").    McShane was not relying on someone else's information to arrest Mr.

Eravi. Rather, McShane was reporting, in real time to his superiors, about what he

was purportedly observing and experiencing.  But as the old saying goes, "garbage-

in-garbage-out" McShane fed his superiors bad – false information – which

apparently motivated his supervisors to give conflicting instructions as to what to do

with Mr. Eravi.

In *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008), the use of force lasted

3 – 5 minutes. *Id.*at 1161.  It was an issue of fact when the district court found that

the officer was present for the duration of the use of force which supported a

'"conclusion that [the officer] had the opportunity to prevent [the plaintiff's]

injuries." *Id* at 1164.  The duty to intervene continues during the entire arrest and

use of force incident.  *See Ross v. Willis*, 2021 WL 3500163, at *15 (S.D.N.Y. Aug.

9, 2021) (denying summary judgment on failure to intervene claim where the

defendant-officers "were in easy reach of" the assaulting officer). Whether McShane

approved or invited the use of force is one thing.  Whether any other officer could

have attempted to stop the initial use of force is another.  And then it is another to

say no officer could not have intervened at any point during the ongoing use of force

*See Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) (nothing suggested officers could not have either physically intervened by getting out of the police car or at least called out to rebuke the assaulting officer). *Id*. at 108.[3]  Each officer had "an affirmative duty to intervene to protect the constitutional rights of [Mr. Eravi] from infringement by [McShane] in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) ("officer who is present but fails to intervene to prevent another law enforcement official from infringing a person's constitutional rights is liable if the officer had reason to know … that any constitutional violation has been committed by a law enforcement official and the officer had a realistic opportunity to intervene to prevent the harm from occurring").

McShane was told by Lt. to detain Mr. Eravi while Sgt. Shipley instructed him to arrest Mr. Eravi.  Nothing in Sgt. Shipley's dialogue instruction reveals what crime she was directing Mr. Eravi to be arrested under.  The point is that McShane's exposure in giving contemporary false real time information is no different than

---

[3] The opportunity to intervene is fact-specific including the duration of the use of force. *See Figueroa* at 107-08 ("Among [many] considerations, of course, the assault's duration will always be relevant and will frequently assume great importance … The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a tacit collaborator in the unlawful conduct of another"); *Merrill v. Fell,* No. 23-7018, 2023 WL 8827665 (10th Cir. Dec. 21, 2023); *Chaney-Snell v. Young*, 98 F.4th 699, 722 (6th Cir. 2024).

making false affidavits supporting an arrest.  Either way, McShane has violated Mr. Eravi's rights.

**THE COMPLAINT DEMONSTRATES MR. ERAVI WAS IN COMPLIANCE WITH MCSHANE IN LEAVING THE AREA WHICH IS FATAL TO AN INTERFERENCE CRIME**

The charging document declared the official duty being exercised was a process serving type.  Fowler opined that the "official duty" he and McShane were purportedly discharging was protecting Mr. Eravi.  Mr. Eravi's presence 50 yards away at the apartment complex did not jeopardize any officer's safety who were crouched within or behind the armored vehicle at the Suspect Residence.  But there was no order mandating that individuals could not enter or leave the apartment complex – or for that matter could not pass through the area under the suggested shelter-in-place advisory.  It was not a mandatory curfew.  The only thing McShane purported to be acting under was a kind of keep-moving-one-way-or-the-other mandate (if the shelter in place advisory could even be construed as such).  Mr. Eravi certainly kept moving parallel to the Suspect Residence in compliance with that purported mandate as conveyed by McShane.  And the fact remains that Mr. Eravi was keeping moving away back to the south in compliance with McShane's wishes at the precise moment McShane misinforms his Sgt supervisor Shipley that "I can't get him to move."  Had McShane reported something remotely truthful like "Eravi is leaving and moving south away from me and the Suspect Residence" there would have never been an arrest ordered.  It cannot possibly follow that Mr. Eravi

complying with McShane's wishes in leaving "knowingly obstructed, resisted, or opposed" McShane in this purported "clear the area" mandate the district court described.

Causation is not broken if a probable-cause determination or prosecutor's charging decision is based on an officer's false statements or exclusion of exculpatory information in a probable-cause affidavit. *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017). Nor is it broken if an individual, though not writing a probable-cause affidavit, "prevaricates and distorts evidence to convince the prosecuting authorities to press charges." *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004). The same principle applies to false contemporaneous statements that influence the decision-maker's decision to arrest.

The fact is the Complaint stated – and the video snapshot clearly shows – that Mr. Eravi was leaving in compliance with McShane's wishes and could not have "substantially hindered or increased the burden" to McShane in "clearing the area" by that compliance. Thus obedience or compliance with what the officer is seeking to accomplish destroys any prima facie case to arrest Mr. Eravi for interference. The cases cited by the lower court indicate the individual never being in compliance. The lower court's citation to *State v Parker* is misplaced as well as bootstrapping interference as a means of justifying probable cause for an arrest. In *State v. Jones,* 202 Kan. 31, 446 P.2d 851 (1968) police already had reasonable grounds to believe

a defendant had committed two murders.  When knocking on the door, the defendant pulled a gun which was interference.  In *State v. Merrifield,* 180 Kan. 267, 303 P.2d 155 (1956), the person was already under arrest but fled into a house and closed the door refusing to go with the officer.   Interference only happened after there was probable cause to arrest. In *State v Parker*, an investigator went to the French Chalet massage parlor to make a prostitution case.  The investigator then told Parker she was under arrest then witnessed her running away then hearing a grinding noise apparently disposing of the marked 20 dollar bills.

The video snapshot speaks a thousand words.  It fully supports Mr. Eravi's contentions that he was leaving the area which, according to the lower court, was the goal of McShane.  The lower court erred in construing the facts contained in the Complaint in a way as though Mr. Eravi was not in compliance when McShane told Sgt. Shipley "I can't get him to move."

**DEFENDANTS GAVE CONFLICTING REASONS FOR MR. ERAVI'S ARREST CLAIMING HE WAS ARRESTED BECAUSE HE DISOBEYED AN ORDER TO STOP AND DISOBEYED AN ORDER TO KEEP MOVING.  DEFENDANTS REASON(S) FOR ARRESTING MR. ERAVI IS A JURY QUESTION**

In the qualified immunity context, courts ask whether there was "arguable probable cause" for the challenged conduct in a search and seizure situation. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Jones v. City and*

*County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988). The was no belief here, reasonable or otherwise, that probable cause existed. The statements of McShane – ultimately his last one stating he couldn't get Mr. Eravi to move – was a flat out lie which then he received two different instructions – detain and arrest – and McShane chose arrest. Established law prohibits McShane from making false contemporaneous statements to his supervisors. *See generally Poolaw v. Marcantel,* 565 F.3d 721, 745 (10th Cir. 2009).

It is plainly proper in this Circuit to assert the "parallel claims" of a "direct violation of his right to free speech, and … for retaliation motivated by his protected speech." *Brandt v. City of Westminster,* 300 F. Supp. 3d 1259, 1282 (D. Colo. 2018). While such claims may be "closely related," they are separate claims and stand on their own. *Id.*

Sgt. Shipley is exposed to supervisor liability as she was the decision maker – in fact overruling her supervisor who said "detain" rather than arrest. *See Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010).[4] The lower court was confronted with different opinions by officers for Mr. Eravi's arrest and dispelled with all of them except for what the lower court read as "dialogue" in the Complaint.

---

[4] Given that it was Sgt. Shipley's decision to overrule her superior and order arrest, other officers opinions about why Mr. Eravi was arrested are speculative given they purport to be acting according to Shipley's order (even though the officers could view Mr. Eravi leaving when the order was given).

One officer stated he heard McShane order Eravi to stop – which the officer claimed Eravi disobeyed by continued movements. McShane says the opposite – that he told Eravi to keep moving and that Eravi disobeyed that command. Then other officers claimed that the purported obstruction crime Mr. Eravi committed was some kind of process service. A jury could reasonable determine that any of those reasons were pretextual or untrue. That the real reason was because Mr. Eravi was recording police activity and that, as in the past, they might or would receive bad publicity. The district court correctly ruled in another case that the "government violates the First Amendment when it physically interferes with plaintiffs engaging in protected First Amendment activities." *Zorn v. City of Marion* No. 24-2044 2025 WL 949079 at *23 (D. Kan. Mar. 29, 2025). And in *Zorn*, this district court cited *Keating v. City of Miami,* (holding that those plaintiffs had stated a 1983 First Amendment claim where police officers dispersed a crowd of peaceful demonstrators). In a different vernacular, according to the lower court' analysis, "dispersal" was McShane's goal in dealing with Mr. Eravi. And Mr. Eravi did "disperse" until he was accosted from behind by those officers.

The law is clearly established and also meets the egregiousness standard. *See Mink v. Knox,* 613 F.3d 995, 1003-04 (10th Cir. 2010) ("It goes without saying that a government official may not base her probable cause determination on an unjustifiable standard, such as speech protected by the First Amendment."); *Worrell*

*v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000) ("We have stated that any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom"); *Turner v. Lotspeich,* 1996 WL 23195, at *2 (10th Cir. 1996) ("clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause"). It is clearly established law that speech that does not constitute fighting words is protected and not a crime. The law of use of force or retaliatory arrest was clearly established prior to Mr. Eravi's arrest. *See Douglass v. Garden City Cmty. Coll.,* 652 F. Supp. 3d 1329, 1345 (D. Kan. 2023). The "law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987). An individual has the right to be free from a retaliatory arrest, even if supported by probable cause, when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been arrested. *Nieves v. Bartlett*, 587 U.S.

391, 407–08 (2019).  At the time Mr. Eravi was arrested, this constitutional right was clearly established.  "Qualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional." *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023); *Buck v. City of Albuquerque*, No. 1:04-cv-01000-WJ-DJS, 2007 WL 9734037, at *42 (D.N.M. Apr. 11, 2007) ("using force against law-abiding demonstrators for the purpose of interfering with their First Amendment rights was contrary to the established law"); *Irizarry v. City & Cnty. of Denver*, 661 F. Supp. 3d 1073, 1091 (D. Colo. 2023) (First Amendment prohibits "subjecting an individual to retaliatory actions for engaging in protected speech").

**A JURY COULD FIND THAT HIS PRESENCE ON THE APARTMENT PROPERTY WAS A PUBLIC FORUM, NOT A CRIME SCENE, THAT HIS FILMING OF POLICE WAS A PROTECTED ACTIVITY, AND THAT HIS ARREST WAS RETALIATORY, AND THAT FORCE WAS USED**

*Any force* exerted by the individual defendant officers against Mr. Eravi caused damages to Mr. Eravi including handcuffing. *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (*en banc*).[5]  The apartment area did not act or quack like

---

[5] "If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest." *Id.* at 1127.  Thus, "even *de minimis* force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008).

a crime scene.[6]  There was no tape or barrier.  No officer was prohibiting entry onto the sacred area called "crime scene."  In fact, it was anything but that as McShane's purpose, according to the district court, was a keep-moving-through-the-purported-crime-scene which on its face is a bit absurd.  The idea that Mr. Eravi was "in the middle of an ongoing crime scene" does not come from the Complaint nor from the mouths of any officer.  But with that the lower court converted a public forum 50 yards away at the apartment into custodial forum.  Declaring the area and Mr. Eravi to be a crime scene is a seizure subject to Fourth Amendment protection. *United States v. Alaimalo,* 313 F.3d 1188, 1192 n. 1 (9th Cir.2002).  But there was no risk of the destruction of evidence relevant to the meaning of a crime scene.

No person would reasonably believe that the few feet in front of the apartment complex was a crime scene,  part of the crime scene, or played any role whatsoever in the commission of the crime purportedly committed by Townsend.  Nothing in the Complaint hints that the apartment complex being a crime scene.  Nothing said during, by any officer, or after the fact, makes that astounding claim.  So Mr. Eravi is, according to the lower court, at a crime scene.  Had anyone told Mr. Eravi that he was in a crime scene or disturbing evidence might have changed the entire

---

[6] A crime scene is defined as an area where a criminal act has taken place or be an area where evidence pertinent to the investigation may be found. Lee, H. (1994) Crime Scene Investigation. Taoyan, Taiwan: Central Police University; USLegal, 'Crime Scene Law and Legal Definition'. [online] Available at: https://definitions.uslegal.com/c/crime-scene'

interactions of defendants and Mr. Eravi. So unknowingly imposed by the district court's determination, Mr. Eravi walked into this undefined crime scene even though nothing indicated that. But having converted the area into a crime scene *ipso facto*, Mr. Eravi was subject to an entire array of police power including custodial interrogation in which he could be detained and questioned. The lower court converted a vast area from the Suspect Residence reaching all the way across the street to the apartment complex as a "crime scene." And designated as a "crime scene" it was no longer a public forum – or for that matter private property. Instead, police had converted it into the forum called "crime scene" in which police can prohibit protected speech including the filming of police. The area in front of the apartment complex was not a crime scene and McShane was not tasked with controlling that scene or retaining evidence. The lower court construed the allegations such that Mr. Eravi was "moving to and fro in the middle of an ongoing crime scene" without analyzing any distance or other factors subsuming property into this different forum called "crime scene." Similar to the pretextual reasons offered by the defendants, a jury could reasonably determine that Mr. Eravi was on a public forum, away from any crime scene, and simply filming police at a reasonable 50 yard distance. A jury could determine that there was no mandatory order by police to stay in or out of the apartment complex – for that matter prohibiting individuals from being at a 50 yard distance in front of the apartment

complex. The apartment property across the street from the Suspect Residence was not a crime scene. There was never a set perimeter. Officers were not tasked with maintaining the integrity of that apartment area as a crime scene. The officers criminalized Mr. Eravi's presence and filming of their activities from a 50 yard distance while situated on private property at that apartment complex. This was not a "25-foot buffer, all but a common width of a two-car garage, or the length of a typical garden hose, or just small steps beyond an NBA three-point line." *Nicodemus v. City of South Bend, Indiana,* 711 F. Supp. 3d 1015, 1025 (N.D. Ind. 2024).

Even if McShane did not appreciate Mr. Eravi's respective rebuffs, "merely arguing with police officers about the propriety of their conduct … falls within the speech exception to [the interference with public duties statute] and thus does not constitute probable cause to arrest someone for interference." *Gorsky v. Guajardo,* No. 20-20084, 2023 WL 3690429, at *8 n.16 (5th Cir. 2023)(collecting cases where "where the interference consisted of physical obstruction or commands to act in a way that interfered with instructions made with legal authority"); *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007) (noting that arguing with officers is not an offense). "A person approached by law enforcement is entitled to ignore his interrogator and walk away." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). At the time of the events in question, it was clearly established that a police

officer may not use force on Mr. Eravi who is complying with a command.  *See*

*Newman v. Guedry*, 703 F.3d 757, 761-64 (5th Cir. 2012) (objectively unreasonable

for officers to injure a man whose "behavior [does] not rise to the level of active

resistance").   While the "acts or omissions of no one employee may violate an

individual's constitutional rights" the "combined acts or omissions of several

employees acting under a governmental policy or custom may violate an individual's

constitutional rights." *Crowson v. Washington Cnty. Utah,* 983 F.3d 1166, 1186

(10th Cir. 2020).

The right to record law enforcement officers performing their duties in public

is recognized in this Circuit.   *Irizarry v. Yehia,* 38 F.4th 1282 (10th Cir.

2022)(internet journalist had a right to record a traffic stop).   It has also been

recognized by seven other Circuits. *See Glik v. Cunniffe,* 655 F.3d 78 (1st Cir.

2011)(a bystander with a cell phone has a right to videorecord officers making an

arrest from roughly ten feet away);  *Fields v. City of Philadelphia,* 862 F.3d 353 (3rd

Cir. 2017)(two individuals videorecording police without interfering with arrests

were protected by the First Amendment); *Turner v. Lt. Driver,* 848 F.3d 678, 688,

689 (5th Cir. 2017) (recognizing "the First Amendment's protection of the broader

right to film"); *Fordyce v. City of Seattle,* 55 F.3d 436, 439 (9th Cir. 1995)(arrest for

videotaping protest and individual protesters was unjustified); *Smith v. City of*

*Cumming,* 212 F.3d 1332, 1333 (11th Cir.2000)(preventing the videorecording of an

arrest violated First Amendment rights; *Sharpe v. Winterville Police Dept.,* 59 F.4th 674 (4th Cir.2023)(town policy banning vehicle occupants from recording their own traffic stops violated First Amendment rights).

The defendants did not set a mandatory no-persons-allowed perimeter even by their own admissions – the shelter-in-place was only advisory. Yet the defendants created a defacto buffer zone only applicable to Mr. Eravi which extended 50 yards from the scene across the street. A "peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik* at 84. The First Amendment "protects the right to remain in the area to be able to criticize the observable police conduct. Otherwise, an officer could easily stop the protected criticism by simply asking the individual to leave, thereby forcing them to either depart (which would effectively silence them) or face arrest." *Jordan v. Adams Cnty. Sheriff's Off.,* 73 F.4th 1162, 1169-70 (10th Cir. 2023); *see also Brown v. Kemp*, 2023 U.S. App. LEXIS 30112, 68 (7th Cir. Nov. 13, 2023) (visual proximity essential to recording activity). These recordings valuably serve law enforcement and the public. They facilitate transparency, training, scrutiny of police misconduct, and exoneration of officers from unfair charges. *See Fields v. City of Phila.,* 862 F.3d 353, 355 (3rd Cir. 2017).

The lower court's reliance on *Glik* supports the plaintiff. In *Glik*, qualified immunity was denied to officers who arrested a person filming them from "roughly

ten feet away." *Glik*, 655 F.3d at 80.[7]  Certainly, persons may be prevented from

getting too close to law enforcement activity if doing so would interfere with the

police, but "peaceful recording … in a public space that does not interfere with the

police officers' performance of their duties is not reasonably subject to limitation."

*Glik* at 84.  "Changes in technology and society have made the lines between private

citizen and journalist exceedingly difficult to draw. The proliferation of electronic

devices with video-recording capability means that many of our images of current

events come from bystanders." *Id.*

CONCLUSION

The district court viewed the Complaint, not as a whole, but "in context"

which ignored the video snapshot and then condensed its view to recited "dialogue"

which the lower court elevated to be incontrovertible truth.  The major in charge told

his officers to warn residents of being advised to shelter in place.  But at no time did

police issue some kind of absolute prohibition like a curfew limiting movement

around the apartment complex area.  Police simply told citizenry they preferred they

stay inside.  A citizen journalist walks unimpeded across the street up to an apartment

---

[7] The woman who recorded George Floyd's murder has reported that she was but a few feet away when she made her recording. Joe Hernandez, NPR, Read this Powerful Statement from Darnella Frazier, Who Filmed George Floyd's Murder, May 26, 2021, at https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnellafrazier-who-filmed-george-floyds-murd (last visited Feb. 26, 2024).

complex where individuals are coming and going. Police are stationed in an armored vehicle 50 yards across the street focused on a specific address and residence. Mr. Eravi films their activities from that distance which in no way hinders anything that those officers were doing.

Mr. Eravi is then confronted by officer McShane who tells Mr. Eravi words to the effect of keep moving. Mr. Eravi does move but not in a way pleasing to McShane. McShane says things to Mr. Eravi to encourage him to leave one way or the other. While Mr. Eravi is dismissive of those efforts in the end he complies by leaving south – back the way he came. He obeyed McShane yet McShane represented to his superiors a bald faced lie – "I can't get him to move. The AXON video snapshot, at 1:35 into that video, which the lower court did not acknowledge, specifically shows the moment:



Mr. Eravi is not walking "to and fro" at all at this moment but is making a straight line south in leaving.  Yet based upon that lie told to Sgt. Shipley, who could also see what was occurring, Shipley ordered Mr. Eravi's arrest. In fact, the officers have to speed up from behind to capture Mr. Eravi as he is walking back south away from McShane in compliance.

The lower court erred in dismissing the plaintiff's claims against the individual defendants.

Michael Eravi respectfully requests oral argument. This case involves important and complex First Amendment issues that greatly affect Michael Eravi's and others' constitutional freedoms. Oral argument will materially help this Court decide the issues.

Dated: May 1, 2025

Respectfully submitted,

s/ Linus L. Baker

Linus L. Baker
6732 West 185th Terrace
Stilwell, Kansas 66085
913.486.3913
linusbaker@prodigy.net
*Attorney for Michael Eravi*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.　　This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,255 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced Times New Roman typeface using Microsoft Word 2019.

Date: May 1, 2025　　　　　　　s/ Linus L. Baker
　　　　　　　　　　　　　　　Linus L. Baker

**CERTIFICATE OF DIGITAL SUBMISSION**

1.      I hereby certify that all required privacy redactions have been made.

2.      I hereby certify that a hard copy of the Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be an exact copy of the version submitted electronically via the Court's ECF system.

3.      I hereby certify that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, Norton 360, and is free of viruses according to that program and is free of viruses according to that program.

Date: May 1, 2025                              s/ Linus L. Baker____
                                               Linus L. Baker

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2025, a true and accurate copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

J MICHELLE R. STEWART

8711 PENROSE LANE, SUITE 400

LENEXA, KANSAS 66219

913-345-9205

MSTEWART@HINKLAW.COM

ATTORNEYS FOR DEFENDANTS-APPELLEES

Date: May 1, 2025                           s/ Linus L. Baker
                                            Linus L. Baker

ADDENDUM

1)     COMPLAINT                 (5/17/2024)

2)     MEMORANDUM AND ORDER    (3/26/2025)

3)     FINAL JUDGMENT          (3/26/2025)

1

AA7

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

| | |
|---|---|
| **Phillip Michael Eravi** | |
| Plaintiff | |
| v. | |
| **David McShane, in his individual capacity** | |
| * | |
| **Meagan Shipley, in her individual capacity** | Case No.   5:24-cv-4042 |
| * | |
| **Grant Foster, in his individual capacity** | |
| * | |
| **Austin Twite, in his individual capacity** | |
| * | |
| **The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas including the Lawrence City Police Department** | |
| Defendants | |

### VERIFIED COMPLAINT

### INTRODUCTION

1. This is a civil rights action seeking damages for the violation of the plaintiff Phillip Michael Eravi's First, Fourth, and Fourteenth Amendment rights, stemming from the Lawrence City Police Department officers' confrontation of Mr. Eravi in a public venue on private property of which the defendants improperly and deliberately escalated. They are overheard on their body cams saying they had "plausible deniability." Mr. Eravi's arrest was born of longstanding systemic bias in that police department towards citizen journalist Phillip Michael Eravi, well known in the Lawerence Kansas area for his civil activism and reporting of police activity.

1



2. This bias was kindling for the overblown confrontation by police in that early morning which ultimately led to a knee-jerk snap decision to arrest Mr. Eravi ultimately resulting in the police department scrambling to come up with many conflicting reasons for Mr. Eravi's arrest – including the fantastic notion that it was for his own safety.

3. But it was really because this plaintiff had been a long standing public irritant to this police force as a well-known citizen journalist who was doing what he routinely did – observe and video record law enforcement and a crime scene from a distance across the street from the crime scene.

4. This Complaint will show visual evidence taken from various body worn cameras that show Mr. Eravi was in a public forum, on private property, wanted to be left alone, continuing to walk casually, neither stopping nor breaking into a run that early morning.  Mr. Eravi was merely carrying his phone which was recording.  He did not carry any weapon of any kind.

5. Defendant City Officer McShane undertook his initial stop of Mr. Eravi on this private property without reasonable suspicion, and nothing during the stop created even arguable probable cause to arrest him for any offense under Kansas law.  Mr. Eravi was not trespassing.  There had been no complaints by the apartment owner(s) as to Mr. Eravi's presence on the front yard of an apartment complex property.

6. The reports made by the defendants and other City officers about this was sometimes speculative pushing a narrative not based upon any personal knowledge or observation, then contradictory, misleading, and off times wholly false,

**3**                                                                      **AA9**

7. The defendants found themselves in a shoot-first-aim-later conspiracy – they communicated with other defendants and City Officers to figure out what purported offense was committed by Mr. Eravi to support his arrest and prosecution.

8. The reports were falsified to cause and support Mr. Eravi's prosecution. Mr. Eravi was charged under K.S.A. 21-5904(a)(3) & (b)(5)(A) as "unlawfully, feloniously, and knowingly obstruct, resist, or oppose a person authorized by law to serve process, to-wit: David McShane and/or other Lawrence Police Officers, in the discharge of any official duty, in the case of a felony, a severity level 9 nonperson felony."

9. If found guilty Mr. Eravi faced a penalty range of a minimum of 5 months to a maximum of 17 months in prison and/or a fine of up to $100,000 and 12 months of post-release supervision.

10. Lawrence City Officers Meagan Shipley, Joshua Doncouse, Amaury Collado, Grant Foster, Steven Koenig, Nicholas Pate, Charles Smyser, Austin Twite, Adam Welch, Adam Zarnowiec, Hayden Fowler, and Noah Pena conspired to provide misleading false facts aimed at providing a false narrative justifying each defendant's actions as they described in their incident reports and testimony given in the Booking 23-01353 and case no. DG-2023-CR-000525.

11. Numerous reports of the Officers and defendants claim or connect the need to arrest Mr. Eravi so that Mr. Eravi would be "out of harm's way" or that Mr. Eravi "distracted" or drew their "attention" to Mr. Eravi. Defendant Twite falsely claimed to dispatch "that Phillip was not complying with commands" which was recited in Twite's incident report. Officer Welch falsely reported as fact in his report that Mr.

Eravi "had walked past perimeter patrol vehicles and was in an active crime scene. Eravi was then approached by officers of the Lawrence Police Department and ordered to leave. Eravi refused to leave…."

12. Officer Pate reported in his incident report that "officers approached him to make contact with him to direct him to leave the area as it was not safe" and that it "appeared the male was not cooperating with officers." Pate stated his "attention was divided."

13. Defendant McShane stated in his incident report that he "commanded him to stop" and that Mr. Eravi "ignored my commands and continued to walk." McShane claimed that "it was clear that several tactical officers were distracted and interfered with by Phillip's actions."  McShane claimed that he "offered several options for Phillip to leave the area but he refused to do." Defendant McShane may have only made suggestions but never gave any commands to Mr. Eravi prior to the decision to arrest him.

14. Major Fowler stated in his incident report that "there were marked LPD cars at multiple street locations, blocking access to the area where the suspect home was located, to keep people from entering" but this was not entirely true.  These LPD cars were parked at some intersections blocking car traffic in certain ways, none of the LPD cars blocked any access to pedestrian traffic.

15. Major Fowler participated in the arrest.  He shined a flashlight on Mr. Eravi's hands and took Mr. Eravi's cell phone.  At no time did Major Fowler intervene to stop the arrest but instead encouraged and assisted in it.

16. Major Fowler stated that defendant McShane "announced via the radio that Eravi was refusing to leave the area" which was untrue as McShane made no such orders and his radio message did not claim that.

17. Major Fowler falsely claimed that Mr. Eravi was "actively resisting officer's efforts" after being told he was under arrest but that was not true:  The moment Mr. Eravi was told he was under arrest there was no resistance from Mr. Eravi..

18. Defendant McShane falsely stated in his report Mr. Eravi "seemed to want [to] meander directly behind the tactical team" when in fact Mr. Eravi was walking away back South away from the tactical team prior to the arrest decision.  McShane falsely claimed that "I aired that Phillip would not leave the area" when in fact what he said was I "can't get him to move" which was also false.

19. Defendant McShane then reported that other officers were sent by defendant Shipley, not because Mr. Eravi was interfering with law enforcement activity, but instead "to assist moving Phillip out of harm's way."  But arresting Mr. Eravi over a bogus charge is not the means nor manner of persuading an individual to purportedly come out of "harm's way."

20. The pretextual "harm's way" narrative that the defendants and other officers continued.  Defendant Foster turned off his body cam camera prior to Fowler's interaction with Mr. Eravi.  But his comments were recorded by other officer's body cams. The statements made by Fowler, after Mr. Eravi was handcuffed and the arrest was completed, pretextually declare that the reason for Mr. Eravi's arrest was for his own safety and also not for disorderly conduct:

| Fowler | We have a safety issue for you. For your protection. |
| Eravi | So you attacked me for my safety? |
| Fowler | We tried to get you to leave the area. You refused |
| Eravi | You guys seriously attacked me for my own safety? |
| Fowler | Listen. Listen. Okay? Trying to talk. Let me talk. All right? We have a complex situation that is going on there. You're directly in the line of fire. |
| Fowler | For your safety we wanted to move you. |
| Eravi | For my safety. |
| Fowler | You refused to move. You refused to move. |
| Eravi | So all of this is about my safety. |
| Fowler | It is about your safety. |
| Eravi | Okay. I don't have anything else to say. Do what we're going to do. |
| Fowler | Okay. But I'm explaining to you. |
| Eravi | Do what we're going to do. |
| Fowler | For your safety, we asked you to move. You refused. |
| Eravi | All this is about my safety. I got it. |

21. Yet in Foster's incident report given after the arrest he pre-textually claimed other justifications for the arrest: "behavior proved distracting to officers working the scene; "Phillip's refusal to leave the area;" "McShane ordered Phillip to stop, but Phillip did follow Officer McShane's commands; "Phillip move back and forth and try to away from Officer McShane, and continue to ignore commands."

22. Foster goes so far as to cherry pick Mr. Eravi's statement in his report about safety out of context ("Yeah, well, I...I guarantee this ain't gonna be good, because you did all this for my own safety, is what you're telling me") – as though Mr. Eravi was admitting he was arrested for his own safety – which is not what Mr. Eravi was saying in sarcasm.

23. Defendant Foster provided a pretextual community-caretaking rationale. *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973); *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir.1992).

7

# AA13

24. And while these defendants do things to protect individuals and keep them safe, they never arrest individuals in order to keep that person "out of harm's way." Similarly situated individuals would not have been arrested. And if there was a probable cause basis, which the plaintiff avers there was not, to do so this was selective prosecution as to Mr. Eravi.

25. Mr. Eravi was not engaged in any apparent or actual criminal activity when defendant McShane confronted and stopped Mr. Eravi, and Mr. Eravi remained either on sidewalk or grass yard of the apartment complex – all of which was private property far from any parked vehicles.   Mr. Eravi did not appear nervous when McShane began asking him questions, nor did he make any attempt to flee the scene. Instead, Mr. Eravi remained calm, and despite McShane's aggressive questioning and intimidating proxemics, Mr. Eravi remained steady and walking filming the scene and the confrontation.

26. The facts do not demonstrate any reasonable suspicion of criminal activity on the part of Mr. Eravi yet the defendants each engaged in an unnecessary rapid escalation of force against him in the early morning hours of May 20, 2023, while on private property. Mr. Eravi's refusal to answer any or each of McShane's questions did not create a reasonable suspicion.  "A person approached by law enforcement is entitled to ignore his interrogator and walk away." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  Not fleeing matters because "flight is different from merely walking or driving away." *Young v. Brady*,793 F. App'x 905, 912, n.4 (11th Cir. 2019).  *See also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Allowing officers confronted with such

7

# AA13

8

AA14

flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning").

27. The facts, including photographic, audio, and video evidence from Mr. Eravi, as well as the defendants themselves, show numerous Lawrence Police policy violations which not only exposed Mr. Eravi to enhanced exposure to danger, but resulted in his physical and emotional injuries.

28. Defendants ignored Mr. Eravi's calm demeanors and explanations.  Instead, they unreasonably extended the stop and ultimately turned it into an unlawful arrest.

29. These facts will show that the actions taken by these defendants were intentional and retaliatory as a result of his prior publications about and contacts with the defendants and their City police force.

30.  Because of an absence of probable cause, any use of force was unreasonable.

31. Mr. Eravi plausibly alleges violations of clearly established Constitutional rights to be free from false arrest, malicious prosecution, and excessive use of force.

32. As Dr. Brent E. Turvey stated in his May 2024 report, after analyzing the facts of this arrest, "these types of retaliatory arrests are often referred to by law enforcement, in court rulings, and in the criminological literature as the imaginary crime of 'contempt of cop.'"

33. Plaintiff seeks compensation for the dignitary, economic, and emotional injuries he suffered as a result of the unlawful seizure and meritless charges brought against him. Plaintiff seeks punitive sanctions against the individual officers to punish them

8

AA14

AA15

for their callous disregard of his Constitutional rights and to deter them from this type of misconduct in the future.

## JURISDICTION AND VENUE

34. This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

35. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

36. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## THE PARTIES

37. Plaintiff Phillip Michael Eravi is a natural person, citizen of Kansas, and legal resident of Douglas County, Kansas. Mr. Eravi is a citizen journalist who provides a valued source of information regarding local news and events, at a time when mainstream news organizations are increasingly disinterested or stretched thin to cover community news.

38. Mr. Eravi operates a YouTube channel, Lawrence Accountability, which audits and documents incidents related to the constitutionality of government employee conduct, such as a City of Lawrence staff, County prosecutors, and local law enforcement. This YouTube channel has been in operation since at least 2021.

AA15

39.  Mr. Eravi has worked in cooperation with other media outlets and journalists to record and provide media coverage of issues relating to government corruption and police use of force, to include members of The Lawrence Times. https://www.aol.com/gladstone-hired-cop-left-op-191909437.html.

40. The media coverage afforded by Mr. Eravi is generally negative, focusing on issues related to misconduct and corruption by government officials and state agents, with an archive of reporting going back at least three years.

41.  The Lawrence Police Department and the Prosecutor's Office have frequently been the focus of Mr. Eravi's reporting, as well as officials in local city government. Mr. Eravi's videos have each been viewed thousands of times or more.

42. The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas. The Lawrence City Police Department is a department of the City of Lawrence, Kansas. The City of Lawrence was at all times relevant to this Complaint responsible for its employees, including the employees of Lawrence Police Department. The City of Lawrence is charged under the law with the duty of hiring, supervising, training, disciplining, and establishing policy such that the conduct of its employees will conform to the Constitutions and laws of the State of Kansas and of the United States of America.

43. At all times relevant to this cause, Defendant Officers either acted in conformance with policy pertaining to, among other things, investigation, arrests, and use of force, as set by Lawerence Police Policy, as well as acting within the course

and scope of their employment or did not act in conformance due to lack of training and oversight.

44. Austin Twite was employed by the Lawrence City Police Department at the time described in this Complaint. Defendant Twite has been in law enforcement and employed as a patrol officer since 2015. Defendant Twite is sued in his individual capacity.

45. Grant Foster was employed by the Lawrence City Police Department at the time described in this Complaint. Defendant Foster has been in law enforcement and employed as a patrol officer since 2021. Defendant Foster is sued in his individual capacity.

46. Meagan Shipley was employed by the Lawrence City Police Department at the time described in this Complaint. Defendant Shipley has been in law enforcement and employed since 2013 and currently a Sergeant. Defendant Shipley is sued in her individual capacity.

47. David McShane was employed by the Lawrence City Police Department at the time described in this Complaint. Defendant McShane has been in law enforcement and employed as a patrol officer since 2022. Defendant McShane is sued in his individual capacity.

**MORE FACTS**

48. This incident occurred in the context of a law enforcement response to a shoot-out that started May 19, 2023, between neighbors; a subsequent active shooter situation; and an undefined /unsecured crime scene.

49. This incident also occurred in the context of a history of highly publicized negative agency media coverage as a citizen journalist by the plaintiff Phillip Michael Eravi.

50. It also occurred in the context of a prior complaint of excessive force by Mr. Eravi, against defendant Twite.  Defendant Twite was one of the officers who participated in the arrest of Mr. Eravi as alleged in this Complaint.

51. Prior to his arrest in the early morning hours of May 20, 2023, Mr. Eravi had multiple negative interactions with the defendants and other Officers of the Lawrence Police Department, documented on both his YouTube channel and by the local media.

52. Prior to his arrest on May 20, 2023, Mr. Eravi had filed a complaint against defendant Twite, one of the arresting officers at the scene, for excessive force.

53. At the scene of Mr. Eravi's arrest, he was recognized by appearance by defendants and other officers, and was referred to as "Mike" by one or more of the defendants.

54. On May 19, 2023, at approximately 10:37 p.m., the defendants responded to a reported shoot-out between neighbors in the 1900 block of Heatherwood Drive. This is a populated residential neighborhood, characterized by homes, an apartment complex, and related vehicle and pedestrian traffic.

55. Upon arrival, defendants determined that one person was injured and rendered aid.  They immediately came to believe that an armed shooter was inside of the home at 1951 Heatherwood Drive.

56. The Lawrence PD Critical Response Team (CRT) was deployed in response to their belief that an armed man was inside of the home at 1951 Heatherwood Drive.

Using an armored vehicle and communicating with a loudspeaker from his driveway, the CRT tried to persuade the suspect Joshua Townsend to give himself up.

57. Officers did not receive a reply. After waiting several hours, law enforcement entered this residence and apprehended Joshua Townsend, identified as the shooter, who was indeed armed.

58. As reported by City Officer Adam Welch: he "was briefed that the suspect, Joshua Townsend DOB [ ] was inside the residence of 1951 Heatherwood Drive, refusing to exit and was armed with a handgun and, who had earlier in the evening fired, several rounds at his neighbor who resided at 1943 Heatherwood Drive. R/O was also told Townsend had access to an AR-15 type rifle."

59. Officer Welch stated "R/O's main duty was to provide cover to all officers on the scene from the turret position of the armored vehicle, which was parked in the driveway of 1951 Heatherwood Drive, facing the opened garage door. R/O noted the interior door leading into the residence, from the garage was opened allowing R/O to view a few feet into the interior of 1951 Heatherwood Drive. Based on the information provided to R/O it was paramount that the opened garage door be covered at all times."

60. Mr. Eravi was across the street from the suspect's house on the private property of the apartments and was not near any area of approach for the police going towards the Suspect's residence.

61. Those living in the neighborhood were not evacuated, rather they were given an advisory to leave the area or shelter in place. However, a "sheltering in place" request

AA20

was made to occupants to stay inside.  Those residing in the apartment complex still remained directly in the line of fire from the suspect's residence.  This sheltering advisory also created the same problem for occupants in adjacent structures and vehicles.

62. Occupants behind a window in the apartments were no less at risk to actual bullet-penetration than if they were standing where Mr. Eravi was as glass or ½ sheet rock is not an effective shield to any caliber of weaponry.

63. Officer Welch's report reflects the seriousness of the situation, and the danger that was present in the neighborhood at the time. It also implies the corresponding duty of care with respect to protecting those living and moving around in the neighborhood.

64. The scene did not appear dangerous to Mr. Eravi because there were no police present when he approached and no scene security tape.  There were no defined and competently attended inner and outer security perimeters that were in place.  They did not exist.

65. There is an abundance of video evidence in this case to permit a jury to infer that the defendants used force after Mr. Eravi had already begun to comply with the defendants vague and confusing statements. If anything, the plethora of video evidence show that Mr. Eravi was told confusing and contradictory statements throughout.  On the night and morning in question, Mr. Eravi's presence as a citizen journalist immediately adjacent to apartment buildings across the street one-half football field length from a suspect's residence posed no threat to police.

AA20

66. In fact, Mr. Eravi was apparently arrested because he, according to the defendants, somehow posed a safety threat to himself by filming police and the area – and this because police continuously spotlighted him and created the very circumstance that drew attention to Mr. Eravi.

67. Mr. Eravi was arrested and suffered excessive use of force because it caused him to suffer some injury including bruising and psychological injuries.

68. At the time of the events in question, it was clearly established that a Lawrence City police officer may not use force on Mr. Eravi who is complying with a command. *See Newman v. Guedry*, 703 F.3d 757, 761-64 (5th Cir. 2012) (objectively unreasonable for officers to injure a man whose "behavior [does] not rise to the level of active resistance").

69. Mr. Eravi owns and operates "Lawrence Accountability," which is a local and independent media source focused on accountability and governmental oversight.

70. During the incidents described in this Complaint, Mr. Eravi legitimately functioned as "press" as that word is understood under the U.S. Constitution and the Kansas Bill of Rights Section 11.

71. Mr. Eravi is a constitutional activist, whose role in the community is that of an unafraid, law abiding, full-time witness to any possible malfeasance and abuse of governmental power.

72. He documents this with the goal of maintaining governmental and law enforcement accountability. Mr. Eravi started doing this important community work in 2020.

73. The defendants had pre-existing animus and bias towards Mr. Eravi as he has reported unflattering, unethical, and illegal activities of law enforcement including the Lawrence police department.  Mr. Eravi has previously made a complaint against defendant Twite to his supervisors.

74. Mr. Eravi was detained by each of the defendants without reasonable suspicion and arrested without adequate probable cause that he had or was committing a crime. Mr. Eravi was walking in a public place, and without warning he was attacked and grabbed by police officers. Mr. Eravi was forcefully moved around by the defendant officers using pain compliance tactics for thirty seconds before he was even informed he was under arrest.  Mr. Eravi was not committing any crime by walking on public or private property.

75. Mr. Eravi was not trespassing or acting unlawful and defendants did not have a reasonable suspicion to detain Mr. Eravi. There was no reasonable suspicion by any defendant that Mr. Eravi had any connection to the events occurring at 1951 Heatherwood Drive that night and early morning.

76. Mr. Eravi's purported lack of cooperation or lack of response to defendant McShane's statements or questions does not factor into any reasonable suspicion analysis. *Schreiner v. Hodge*, 315 Kan. 25, 504 P.3d 410, 419 (2022); *State v. Andrade-Reyes*, 309 Kan. 1048, 1057, 442 P.3d 111 (2019).

77.  Mr. Eravi has a Fourth Amendment right to be free from an unreasonable stop or seizure.  Defendant McShane's actions of saying that Mr. Eravi could walk and be

16                                                            AA22

a "free man" conflicted with defendant McShane's actions of following, or what might be considered vaguely herding Mr. Eravi to an unknown destination.

78. Mr. Eravi was told by defendant McShane that he could walk and that he was a free man.  Yet the same officer then suddenly, without notice or warning, then forcibly stopped, detained, and arrested him as Mr. Eravi had moved back South parallel to the private property of the apartment.

79. At approximately 10:40 p.m. on May 19th into the 20th, 2023, police were called out to the 1900 block of Heatherwood Drive in Lawrence, Kansas, to an alleged report of a neighbor, Joshua Townsend, allegedly shooting at another neighbor whose name is not listed in the police reports.

80. Defendant David McShane, the police department officer who arrested Mr. Eravi on May 20, 2023. Defendant McShane's last day on Lawrence Police Department was the next day – May 21, 2023.

81. Lawrence Police Officers reported that a "stand off" with Joshua Townsend sometime between 11:00 p.m. and 4:00 a.m. was occurring at or near 1951 Heatherwood Drive.

82. Mr. Eravi was out walking in an unmarked, un-perimeter, public place at the time. There was no so-called perimeter established by the Lawrence Police Department.

83. There were no officers present in the police vehicle on the South side from which Mr. Eravi approached, and no officers were present to instruct anyone from walking from the Southside Northward.

84. Mr. Eravi walked up to the unoccupied patrol car to ascertain what was happening.  But the computer screen was blank.



85. Despite later claiming that the "officers were tasked with keeping citizens away from the immediate location for their own safety" there was no crime scene tape placed, nor was any visible, tangible, perimeter ever established at the scene by officers, other than the armored vehicle parked in the driveway of 1951 Heatherwood Drive.

86. Police did not provide any notice to the public or do anything, prior to Mr. Eravi's encounter, that indicated that foot traffic was no permitted where Mr. Eravi was walking.

87. An ariel view of the area is below:



88. The ariel describes the location of the initial exchange of gunfire and Joshua Townsend's residence. A police car blocked entry onto Heatherwood Drive but did not block pedestrian traffic on the East side sidewalk.



20 AA26

89. There was no pedestrian perimeter where Mr. Eravi was because defendants had not specifically contemplated pedestrian traffic adjacent to the apartment.

90. Not only was there no perimeter, it was the officers located at the Suspect's Residence that saw Mr. Eravi approach from the South. The responding officer McShane was located farther North on the street where the Initial Exchange of Gunfire is located on the map.



91. The ariel also depicts the approximate distance of 150 feet from where Mr. Eravi was confronted by Lawrence police. Mr. Eravi has been on numerous scenes, whether described as a crime scene, which is similar to this area and circumstance.

92. In those prior occasions where Mr. Eravi was present at a scene, he was not harassed, detained or arrested by police. Lawrence police officers know Mr. Eravi by sight, who he is, and what he does to attempt to help the community.

93. Yet defendant McShane asked Mr. Eravi "what's your name?"

20 AA26

94. The entire walk Mr. Eravi took that night up Heatherwood Drive was completely open to the public, with no visible blockade or barriers.



95. Defendant McShane's Axon body cam begins at the point where he yells at Mr. Eravi at 1:53 a.m. Defendant McShane reported that he "took a perimeter position to the south of 1951 Heatherwood in the backyard of 2007 Heatherwood Drive, until [he] was relieved by tactical officers."

96. Defendant Seargent Megan Shipley arrived on scene at approximately 11:43 p.m., and was assigned the task of team leader for the "contact team" that deployed outside of an armored vehicle that was parked in the driveway of the Townsend residence. Defendant Shipley reported that "we deployed to the outside of the armored vehicle at approximately 1:10 a.m."

97. At 1:43 a.m. Lieutenant Mark Unruh instructed two officers to suggest people in the apartment across the street "shelter in place" or leave – but did not require the officers to order either of those two suggestions:

> Unruh "Anybody that's in direct line with that, can you just knock on the door and let them know, Hey, we got an incident going on. We're worried about the potential of gunfire. We would advise that you probably leave for the night. And that they need to leave out that way and then go all the way down. But if they're going to shelter in place, then they're going to shelter in place. Can you do that for me?"

98. Defendant Shipley reported that the armored vehicle was used "to protect people from bullets." Another Lawrence officer, Seargent Ashley, called out on the PA system for Mr. Townsend to exit the residence.

99. Major Hayden Fowler was the highest ranking officer at the scene who knew who Mr. Eravi was by sight. Fowler was familiar with Mr. Eravi as being often present and reporting on police incidents. Fowler informed the officers that it was Mr. Eravi. Fowler saw Mr. Eravi walking northbound and was able, and did, observe all of the walking movements of Mr. Eravi.

100. According to her report, at approximately 1:53 a.m. on May 20, 2023, defendant Shipley saw a subject whom she recognized as Mr. Eravi walking northbound in the 2000 block of Heatherwood Drive on the east side of the sidewalk holding his phone recording which is opposite from the side where she was behind the armored vehicle parked in the Townsend's driveway. Defendant Shipley was able to and did observe all of the movements of Mr. Eravi.

101. The below graphic shows in green where Mr. Eravi was walking. It turns to yellow where Mr. Eravi is spotlighted by defendant McShane. The red dot is the point

that defendant McShane first makes physical contact with Mr. Eravi. The blue line indicates the Douglas County Sheriff's office vehicle arriving with CRT members inside, as McShane and Foster were grabbing Mr. Eravi and joined in as he moved South. The CRT members were already walking South when Mr. Eravi was at the top on the red line. but that did not occur until after Mr. Eravi was arrested which is indicated at the top of the red line.



102. Defendant Shipley was able to, and did in fact, personally observe all of Mr. Eravi's walking movement in front of the apartment that late evening and early

morning. Defendant Shipley had no need to rely upon Defendant McShane's descriptions of Mr. Eravi "not moving" when Defendant Shipley personally witnessed that Mr. Eravi was moving and in fact moving back South parallel close to the apartment complex's private property. at the time when she made her order to arrest Mr. Eravi.

103. As Mr. Eravi walked Northward two individuals appear in the distance.



104. Then one individual turns a light on as Mr. Eravi approaches the sidewalk entrance to the apartments.   Mr. Eravi continues walking Northward on the sidewalk.  The light goes off.



105. As Mr. Eravi reaches the apartment sidewalk entrance, the light is back on:



106. Mr. Eravi continued walking North and reached the second apartment approach where he turns towards the apartment doors:



107. The dialogue from the green-to-yellow point to the red dot as Mr. Eravi walked

North was as follows:

| McShane | (00:29): | Hey. Stop right there. Gotcha. Watch that. |
| Eravi | (00:49): | Get your lights out of my eye. |
| McShane | (00:57): | No, come on. You can't be right here. |
| Eravi | (01:00): | What? |
| McShane | (01:00): | Who are you? |
| Eravi | (01:01): | There's no... |
| McShane | (01:02): | Come on. |
| Eravi | (01:02): | There's no lines. |
| McShane | (01:03): | Keep an eye on that for me. |

108. Even though Unruh was careful to inform neighbors not to turn on lights when

officers approached, or for officers not to be in the light, all for officer safety, the same

safety precautions didn't apply to Mr. Eravi.  At the green to yellow point, defendant

McShane spotlighted Mr. Eravi which, if Mr. Eravi's purported risk of being shot at

from the Suspect Residence increased and did not increase:



109. At the red dot, defendant McShane makes physical contact with Mr. Eravi.



110.  Both officers approached, one looks away, and defendant McShane has his right

hand positioned:



111. Mr. Eravi attempted to put distance between himself and the defendant McShane walking East towards the apartments as indicated by the yellow line.  Mr. Eravi then headed North parallel close to the apartment building and then turns around and heads South depicted in the graphic.  As Mr. Eravi was walking away from the Suspect Residence McShane has misrepresented to his supervisor defendant Shipley that Mr. Eravi is "not moving" and is in front of the police armored vehicle located at the Suspect Residence.  The dialogue from the red dot where defendant McShane physically contacted Mr. Eravi till was walking back South to the beginning of the red line was as follows:

| Eravi | (01:04): | Don't touch me. |
|---|---|---|
| McShane | (01:05): | If you want to walk, walk. But I have to cover you. Let's go. |
| Eravi | (01:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (01:16): | You live here? |
| Eravi | (01:16): | You need to leave me alone. |
| McShane | (01:19): | Come on. Just get inside if you live here. |
| Eravi | (01:20): | You need to leave me alone. |
| McShane | (01:21): | Sir, I need you to leave. |
| Eravi | (01:23): | You need to leave me alone. |
| McShane | (01:24): | I will. Just keep walking. |
| Eravi | (01:27): | I'm a free human being. You need to leave me alone. |
| McShane | (01:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (01:30): | Leave me alone. |
| McShane | (01:30): | I'll walk with you. |
| Eravi | (01:31): | Leave me alone. |
| McShane | (01:34): | I can't get him to move. |
| Eravi | (01:37): | You motherfuckers woke me up. Leave me alone. You woke me up. |
| McShane | (01:39): | What's your name? |
| Eravi | (01:40): | You woke me up. You got me out here. Leave me alone. |
| McShane | (01:42): | Okay. Come on. |
| Eravi | (01:43): | Get off me, dude. |

112. And despite claiming this purported purpose was only "safety" the defendant officers later pretextually claimed there was a different purpose – that they were attempting "service of process."

113. Defendant Twite reported that "Officer McShane and Officer Foster approached" Mr. Eravi.  Defendant Twite falsely reported that both were speaking with Mr. Eravi when only one officer had. Defendant Twite falsely reported that both ("they") said Mr. Eravi "was not complying with commands" when no commands had been given to Mr. Eravi by either.  In his report, defendant Twite falsely reported that both reported to "dispatch" claiming Mr. Eravi was not complying with commands when the actual verbiage was "I can't get him to move."

114. Mr. Eravi walks North to the end of the apartment building where a police vehicle is parked with no lights and no emergency lights.



115. In defendant Foster's report he  claimed that "Officer McShane ordered [Mr. Eravi] to stop" while nothing spoken by defendant McShane after that initial confrontation and prior to the arrest, could be reasonably understood as an ongoing command to Mr. Eravi to stop walking.

116. As Mr. Eravi walked back to the South he looked over at the individuals at the armed vehicle:



117. In defendant Shipley's report, she stated that "I informed Officer McShane that Eravi could not stand behind the armor" and that defendant McShane stated Mr. Eravi "was not listening." Defendant Shipley then stated she told defendant McShane to arrest Mr. Eravi.

118. Mr. Eravi turned around and headed back South and another unlit parked police vehicle was located on the other side of the street:



119. But the joint communications involving Lieutenant Mark Unruh, defendant McShane, and defendant Shipley indicate that Lieutenant Unruh said to "detain" and not arrest Mr. Eravi according to Unruh's body cam video:

Unruh Yeah, we got units going down there to make contact.
Shipley Okay, he's continuing to come closer.
Unruh Yep, we got guys right there walking towards him. I don't know if that's our subject or not.
Shipley He can't be right behind the armor.
McShane I can't get him to move.
SHIPLEY: ..Just arrest him
Unruh Go ahead and detain him.
***
Unruh The team is showing up.. What the fuck was that over there?
Gross I didn't see who it was, I think it might have been Eravi
Pate It was Eravi [inaudible 02:56:18].

120. Defendant Shipley later testified she did not hear her superior Lt. Unruh say to detain Mr. Eravi and further testified that even if she had heard this command she would have overridden Lt. Unruh's detain command.

32                                                                          AA38

121. Despite being told by Lt. Unruh to merely detain Mr. Eravi, defendant McShane ignored that command and arrested Mr. Eravi.

122. Defendant McShane falsely claimed in his report that he told Mr. Eravi he could "continue walking through to the north" and then characterized the area not as dangerous but merely a "potential dangerous areas."

123. Sgt. Shipley and Officer McShane both made reports that "neighboring residents had been evacuated or told to shelter in place due to danger to the public" although this was not true if "told" means commanded as the statements were merely suggestions and none of the police body cams substantiate those claims.

124. At no time was Mr. Eravi advised by any Lawrence police officer that he was in danger, in a crime scene perimeter, that police were attempting process of service, or that there was any likelihood of shots being fired.

125. Defendant McShane's body cam footage that was provided to Mr. Eravi was only eight minutes and 35 seconds which appears to be incomplete.

126. Defendant McShane told Mr. Eravi he could walk and to just keep walking, but that McShane would assure Mr. Eravi's police protection and safety -- McShane would act as Mr. Eravi's protective shepherd (i.e. "cover him") indicating Mr. Eravi was still free to walk and would be escorted and always protected by that officer. This was "a specific promise or representation by the officer." *See Taylor v. Phelan*, 9 F.3d 882, 885 (10th Cir. 1993) ("by assuring the Taylors of their safety pending the arrest, the Missouri police made specific promises justifying reliance by the Taylors"); *Hendrix v. City of Topeka*, 231 Kan. 113, 137, 643 P.2d 129 (1982) ("Liability against

a police officer may be predicated upon breach of specific promises or representations such as failure to provide promised protection").

127. This affirmative statement coupled with defendant McShane's actions imputed a "special duty" upon defendant McShane to recognize Mr. Eravi's Constitutional rights to walk in public areas, film police or other areas, conduct himself as press to inform the public, as well as clearly articulate to Mr. Eravi exactly how, where, and why Mr. Eravi could be present or not present – which defendant McShane breached that special duty and was negligent in so doing.

128. McShane's promise and actions increased the risk of injury to Mr. Eravi via being shot or arrested by spotlighting him continuously, continuously drawing attention to Mr. Eravi, and then failing to accurately communicate Mr. Eravi's actions which led to his battery, assault, arrest, and subsequent physical injuries.

129. In fact, all of the claimed "distractions" by the defendants only came after the decision was made to arrest Mr. Eravi and his actual arrest.  No officers were "distracted" or hindered from performing any official duty by Mr. Eravi's presence prior to his improper detention and arrest.

130. Moreover, this special duty upon defendant McShane required him to accurately convey to his supervisor defendant Shipley exactly what Mr. Eravi was doing in terms of his direction of travel and responses to defendant McShane – which defendant McShane was negligent in so doing.



131. The breach of this special duty by the defendant McShane caused Mr. Eravi's actions to be misconstrued by defendant Shipley, then falsely arrested and injured during the arrest.

132. Defendants admitted that Mr. Eravi was told that "he was free to walk through the area" – despite purportedly later claiming (and did not say to Mr. Eravi) that doing so would place Mr. Eravi "in the line of fire" and placed Mr. Eravi "in harm's way."  Defendants also later claimed that Mr. Eravi was free to walk as long as he would be "covered by an officer if he wanted to do so" and then claimed Mr. Eravi was told he "could not linger in the immediate vicinity."

133. Defendants admitted that Mr. Eravi "was free to remain in the general area" yet arrested him for being in the general area.

134. Mr. Eravi was not in the immediate vicinity of an armed standoff being where he was located.

135. Defendant McShane never told Mr. Eravi of a specific location where he "could linger."

136. Mr. Eravi never prevented any of the defendant officers from performing their official duties related to the 1951 Heatherwood Drive location at that time.

137. Mr. Eravi told defendant McShane he did not need to be covered. Defendant McShane then told Mr. Eravi he needed to leave, but never told him why, or that he was in any perimeter, crime scene, or that he was in any danger.

138. Mr. Eravi told defendant McShane that he was a free human being and defendant McShane agreed with him. Mr. Eravi reasonably believed that defendant

McShane was communicating to him that Mr. Eravi was free to be where he was and was free to walk with his telephone.

139. Defendant McShane then falsely reported to other officers that he "can't get him to move" but Mr. Eravi was continuously moving.



140. Defendant McShane reported that Mr. Eravi was moving: "ignored my commands and continued to walk." Yet,  defendant McShane later said  to "just keep walking" so which statement was Mr. Eravi supposedly not complying with?

141. In fact, Mr. Eravi was moving away from defendant McShane and was, at the time, walking South further away from 2000 Heatherwood from where McShane originally confronted Mr. Eravi.

142. Defendant McShane reported to the command post that Mr. Eravi was located in front of 1925 Heatherwood Drive as though Mr. Eravi was near when in fact  he

was across the street some 150 feet away in front of apartment buildings across the street from the Suspect Residence.

143. Defendants falsely claimed that Mr. Eravi "refused to comply" with defendant McShane's "order to evacuate the immediate vicinity."

144. According to the defendant Shipley, Mr. Eravi was arrested because he stood behind the armor or for not listening.  Defendant Shipley stated in a report that "I informed Officer McShane that Eravi could not stand behind the armor. Officer McShane advised Eravi was not listening. I informed Officer McShane to arrest Eravi."

145. Even as defendant McShane was again falsely reporting to defendant Shipley that he "can't get him to move" Mr. Eravi had constantly been moving and was in fact walking South making no movements towards the Suspect Residence:





146. Mr. Eravi continues to walk South making no movements towards the Suspect Residence followed by defendant McShane. It also demonstrates defendant McShane continued to light himself up as well as another officer standing out in the open:



147. Despite walking back South defendant McShane does not inform defendant Shipley of Mr. Eravi's continual movement and particularly his movement South. Based upon the false, misleading, and incomplete information from defendant McShane to defendant Seargent Meagan Shipley, defendant Shipley instructed defendant McShane to arrest Mr. Eravi as Mr. Eravi was walking South.

148. Defendants falsely claimed that Mr. Eravi "attempted to walk directly across from the residence."  The physical contact and timing of the detention of Mr. Eravi is depicted approximately below:

AA45



149. Mr. Eravi had a previous incident with Officer Twite in which defendant Twite assaulted and battered Mr. Eravi. Defendant McShane, Foster, Twite, then physically restrained Mr. Eravi which caused injury and pain to Mr. Eravi. Mr. Eravi repeatedly visibly and orally expressed pain where the defendants were each intentionally using techniques that were purposeful to cause Mr. Eravi pain including body and neck restraints, bending of the wrists and twisting of Mr. Eravi's fingers.

150. Defendants deliberately inflicted severe pain upon Mr. Eravi.

151. Mr. Eravi asked them why these defendant officers Twite, McShane, Foster, and Fowler were "roughing" him up. None of those defendants explained to Mr. Eravi that he was being detained or arrested at that time.

152. Later, when the defendants do tell Mr. Eravi he was being detained and arrested, Mr. Eravi complied although Mr. Eravi has no idea as to why he was being arrested and tells the officers that.

 AA45

AA46

153. More dialogue with Mr. Eravi and defendants occurred:

| McShane | (01:44): | Let's go. |
|---------|----------|-----------|
| Eravi | (01:45): | Hey. Why are grabbing? |
| McShane | (01:46): | Let's go. |
| Eravi | (01:46): | Why are you fucking roughing me up, motherfucker? |
| McShane | (01:49): | Come on. Let's go. |
| Eravi | (01:50): | Why are you roughing me up, motherfucker? |
| McShane | (01:50): | Because [inaudible]. Hey. |
| Eravi | (01:53): | Hey. You dude can't be roughing me up like this. |
| McShane | (01:56): | Let's get him out in front of the house. |
| Eravi | (01:56): | What the fuck? |

AA46

| McShane | (01:57): | I'm not roughing you up. Let's go. |
|---|---|---|
| Eravi | (01:59): | Hey, man. Get the [02:00] fuck off me, man. I'm a |

free fucking human. Get the fuck off me. What's your name? Your name.

| McShane | (02:07): | Come on. |
|---|---|---|
| Eravi | (02:07): | What is your fucking name? |
| McShane | (02:09): | We're almost there. |
| Eravi | (02:09): | What are your fucking names? |
| Zarnowiec | (02:09): | It's Zarnowiec. Just chill, man. Chill. |
| Eravi | (02:09): | Who's this? Who [inaudible 02:10] got a hold of |

me. Hey, who the fuck are you?

| Zarnowiec | (02:09): | Stop. Mike. |
|---|---|---|
| Eravi | (02:09): | Name. |
| Zarnowiec | (02:09): | You're under arrest right now. |
| Eravi | (02:19): | Name. |
| Zarnowiec | (02:19): | Okay? |
| McShane | (02:19): | It's Officer McShane. |
| Eravi | (02:20): | Name. |
| Zarnowiec | (02:20): | Put your hands behind your back. Okay? |
| Eravi | (02:21): | Why am I under arrest? |
| Foster | (02:22): | For interfering, Mike. |
| Eravi | (02:26): | Dude, you guys fucking woke me up in the middle |

of the fucking night.

| Zarnowiec | (02:29): | I just [00:02:30] pulled up to this, man. |
|---|---|---|
| Eravi | (02:30): | With all your fucking sirens and shit, dude. |
| Zarnowiec | (02:32): | All I know is they said that you're under arrest for |

interfering.

| Eravi | (02:33): | Ow! |
|---|---|---|
| Twite | (02:33): | Quite fightin man, you're gonna get hurt. |
| Eravi | (02:36): | Can you tell him to not fucking... Ow! |
| Zarnowiec | (02:38): | Yeah, but you need to stop fighting. |
| Eravi | (02:39): | He's ripping my finger apart. Bending my wrist. |
| Zarnowiec | (02:42): | Just relax. Be quiet. |
| Eravi | (02:43): | There's no reason for all that. |
| Zarnowiec | (02:44): | Well, I saw you fighting, man. I saw you. |
| Eravi | (02:46): | I wasn't fighting, dude. |
| Zarnowiec | (02:47): | You were. |
| Eravi | (02:47): | They grabbed me. |
| Zarnowiec | (02:48): | I could see your [inaudible 02:50]. |
| McShane | (02:49): | [inaudible 02:50]. |
| Zarnowiec | (02:50): | Green sweatshirt, man. |
| Eravi | (02:51): | They grabbed all over me, man. |
| Zarnowiec | (02:53): | Hey, Mike. |
| McShane | (02:53): | You okay? [inaudible 02:54]. |
| Eravi | (02:53): | McShane and who? |
| McShane | (02:56): | Just me. |
| Eravi | (02:57): | Foster. |

154. Fowler told Mr. Eravi this was all "about your safety" and that Mr. Eravi "refused to move" which was false:

42

AA48

| Fowler | (05:04): | I'm going to explain to you what's going on. |
| Eravi | (05:06): | You guys attacked me for no reason. |
| Fowler | (05:07): | We have a safety issue for you. For your protection. |
| Eravi | (05:12): | So, you attacked me for my safety? |
| Fowler | (05:14): | We tried to get you to leave the area. You refused. |
| Eravi | (05:15): | You guys seriously attacked me for my own safety? |
| Fowler | (05:18): | Listen. Listen. Okay? Trying to talk. Let me talk. All right? We have a complex situation that is going on there. You're directly in the line of fire. |
| Eravi | (05:28): | Okay. |
| Fowler | (05:29): | For your safety we wanted to move you. |
| Eravi | (05:30): | For my safety. |
| Fowler | (05:30): | You refused to move. You refused to move. |
| Eravi | (05:33): | So, all of this is about my safety. |
| Fowler | (05:34): | It is about your safety. |
| Eravi | (05:41): | Okay. I don't have anything else to say. Do what we're going to do. |
| Fowler | (05:41): | Okay. But I'm explaining to you. |
| Eravi | (05:41): | Do what we're going to do. |
| Fowler | (05:41): | For your safety, we asked you to move. You refused. |
| Eravi | (05:43): | All this is about my safety. I got it. |

155. So despite defendant McShane informing Mr. Eravi that he could walk keep walking and that defendant McShane would "cover him" Mr. Eravi did, in fact, walk and keep walking and at the time of the arrest was moving away South from the Suspect's Residence.

156. Defendants McShane, Foster, Twite then say Mr. Eravi was being arrested for "interference" – yet other individuals at the location were outside, walking around, some walking with their dogs, yet only Mr. Eravi was confronted and arrested.

157. No purported "service of process" to anyone was occurring at the time Mr. Eravi was confronted and later arrested.

158. At the time Mr. Eravi was arrested defendant Shipley was not wearing the CRT helmet cam, which, according to police protocol and training, defendant Shipley would need for contact with and service to Townsend.

42

AA48

159. Townsend was not contacted by police and removed from his residence until approximately 4:00 a.m. on May 20, 2024.

160.  On May 28, 2023, Sgt. Megan Shipley filed a signed and sworn Affidavit alleging misleading or false facts to charge Mr. Eravi with felony interference.

161. In paragraph 3 of the affidavit Sgt. Shipley swears that "during the alleged incident" the Lawrence Police Department obtained a signed lawful search warrant to enter the residence of 1951 Heatherwood Drive.

162. Sgt. Shipley materially omits that her team was in no way ready to serve the warrant prior to Mr. Eravi's arrest. In fact, the warrant wasn't attempted to be served until well after Mr. Eravi had already been arrested.

163. In paragraph 4, Sgt. Shipley swears that "Officers took precautions by evacuating neighbors and or advising them to shelter in place"  but at no time was this made a requirement subjecting those residents to arrest if they did not do so.

164. Sgt. Shipley swore that "a marked Lawrence Police Department Vehicle with illuminated overhead emergency lights was parked on Heatherwood Drive, south of the address blocking traffic to prevent vehicles or pedestrians from traveling north. These precautions were in place to reduce and prevent anyone from entering the area in case of an unfortunate incident of gunfire." This statement is a materially false statement.

165. No police vehicle was blocking traffic or pedestrians from traveling north. No precautions were in place to prevent anyone from entering the area.  There was

absolutely no perimeter established and Mr. Eravi was free to walk without obstruction to the area where Mr. Eravi was ultimately arrested.

166. In paragraph 7 of her affidavit, Sgt. Shipley falsely claims that Officer McShane illuminated Eravi with his flashlight and commanded him to stop.  She swears that Mr. Eravi ignored Officer McShane's commands and continued to walk directly across from 1951 Heatherwood Drive where officers were attempting to serve a search warrant to enter the residence and contact the individual involved yet omits that McShane had later told Mr. Eravi to keep walking.

167. These statement are false and misleading.  There was no search warrant that was attempted to be served at that time. The statement omits that defendant McShane told Mr. Eravi that if he wanted to walk, he could walk, that Officer McShane agreed that Mr. Eravi was a free human, and that Officer McShane said he would leave Mr. Eravi alone.

168. Defendant Shipley omitted that Mr. Eravi was never told he was in a danger zone, that there was a risk of gun fire or any heightened risk whatsoever. Instead, Sgt. Shipley swore in paragraph 8 that "Eravi placed himself in harm's way" even though Mr. Eravi had no notice of any alleged "harm's way" and which defendant Shipley claimed Mr. Eravi was actually behind the police department's armored vehicle, which, if true, was likely the most safe place to be at that address.

169. In paragraph 8 defendant Shipley falsely claimed that "Officer McShane offered for Eravi to enter the actual apartment complex itself simply continue walking to the north, out of and potential dangerous areas."

170. The affidavit omits that defendant McShane told Mr. Eravi that he agreed that Mr. Eravi was a free man, McShane would walk with Mr. Eravi, that McShane told Mr. Eravi he would leave Mr. Eravi alone, and only asked Mr. Eravi to keep walking.

171. In paragraph 9 of the affidavit defendant Shipley swears that she informed Officer McShane that Mr. Eravi could not be located behind the police department's armored vehicle. Sgt Shipley materially omits that. Mr. Eravi was not standing directly behind the armored vehicle, he was across the street and several yards away, and he was not standing still, he was moving. Sgt. Shipley swears that she gave Officer McShane the order to arrest Eravi, but she was not fully informed as to what actually was taking place. Furthermore, she materially omits that her commanding officer gave the order to detain Mr. Eravi, after her order to arrest, which should have trumped her order.

172. In paragraph 10, Sgt. Shipley swears that McShane used force compliance techniques too, and that Eravi "actively resisted" this use of force. Sgt. Shipley materially omits that no officer, including McShane. communicated to Mr. Eravi that he was being arrested at that time and that it wasn't until 30 seconds later that Mr. Eravi was informed that he was being arrested.

173. In paragraph 11, Sgt Shipley discusses a canine partner named Shadow, with handler, Officer Doncouse and how Shadow reacted to Mr. Eravi's illegal and unannounced arrest. Sgt. Shipley materially omitted that Shadow had been acting up prior to this and further that there was a woman walking her dog at this time nearby as well.

174. At paragraph 13 Sgt Shipley swears that around 3:00, well after Mr. Eravi was arrested and taken to jail, that "two other parties attempting to film Officers Actions directly across from the involved residence." Sgt Shipley stated how Officer McShane explained the situation to the parties, and how their location was not safe. Sgt. Shipley materially omitted from the affidavit that no officer, including Officer McShane ever "explained the situation" to Mr. Eravi and how the location "was not safe" to Mr. Eravi.

175. Defendant Twite had previously confronted and abused Mr. Eravi when Mr. Eravi was about to be released from handcuffs, Mr. Eravi stood staring directly at and in front of the defendant Twite.  While Mr. Eravi was handcuffed, and without any justification, defendant Twite pushed Mr. Eravi backwards.

176. As a result of this encounter, false affidavit, and arrest, Mr. Eravi was charged with a level 9 nonperson felony citing K.S.A. 21-5904(a)(3) & (b)(5)(A). Mr. Eravi did not knowingly obstruct, resist, or oppose a person authorized by law to serve process. But as previously stated, defendant McShane was not serving process when he confronted Mr. Eravi, and such reasons are pretextual to the real reason why Mr. Eravi was detained and arrested.

## FIRST CAUSE OF ACTION
### PRIOR RESTRAINT AND RETALIATORY POLICY OF PROHIBITING THE  EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (MONELL LIABILITY CITY OF LAWRENCE)

177. Plaintiff Mr. Eravi repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

178. Mr. Eravi was engaged in First Amendment protected activities at all times as referred to in this Complaint. The First Amendment protects the right to photograph, to record matters of public interest, observe governmental operations, and even the commission of a crime. *See Project Veritas v. Schmidt,* 72 F.4th 1043, 1065 (9th Cir. 2023). Video recording is unambiguously speech-creation and not mere conduct. *Irizarry v. Yehia,* 38 F.4th 1282, 1292 (10th Cir. 2022).

179. Plaintiff Eravi was video recording at all times in a public forum, and then on private property accessible to the public.

180. There was a clearly established right to record police officers in public places as of May 2020.

181. The Lawrence Police Department Policy functions as a prior restraint to protected speech, is biased against the exercise of protected speech, and builds into the Department systemic malice and prejudice to individuals who photograph or videotape police activities.

182. The Policy does not target or similarly limit individuals who witness, without recording, the same police presence or activities. But if the citizen is recording police

presence and activities, the Policy empowers its officers to engage in limiting First

Amendment conduct simply because the citizen is recording.

183. Pursuant to the Lawrence Police Department Policy Manual 425.3

("RECORDING LAW ENFORCEMENT ACTIVITY") it states:

Members of the public who wish to record law enforcement activities are limited only in certain aspects.
(a) Recordings may be made from any public place or any private property where the individual has the legal right to be present.
(b) Beyond the act of photographing or recording, individuals may not interfere with the law enforcement activity. Examples of interference include, but are not limited to:
1. Tampering with a witness or suspect.
2. Inciting others to violate the law.
3. Being so close to the activity as to present a clear safety hazard to the officers.
4. Being so close to the activity as to interfere with an officer's effective communication with a suspect or witness.
(c) The individual may not present an undue safety risk to the officer, him/herself or others.

184. Policy 425.4 ("OFFICER RESPONSE") states:

Officers should request that a supervisor respond to the scene whenever it appears that anyone recording activities may be interfering with an investigation or it is believed that the recording may be evidence. If practicable, officers should wait for the supervisor to arrive before taking enforcement action or seizing any cameras or recording media. Whenever practicable, officers or supervisors should give clear and concise warnings to individuals who are conducting themselves in a manner that would cause their recording or behavior to be unlawful. Accompanying the warnings should be clear directions on what an individual can do to be compliant; directions should be specific enough to allow compliance. For example, rather than directing an individual to clear the area, an officer could advise the person that he/she may continue observing and recording from the sidewalk across the street.
If an arrest or other significant enforcement activity is taken as the result of a recording that interferes with law enforcement activity, officers shall document in a report the nature and extent of the interference or other unlawful behavior and the warnings that were issued.

185. Policy 425.5 ("SUPERVISOR RESPONSIBILITIES") states:

> A supervisor should respond to the scene when requested or any time the circumstance indicates a likelihood of interference with a crime scene, investigation or other unlawful behavior.
> The supervisor should review the situation with the officer and:
> (a) Request any additional assistance as needed to ensure a safe environment.
> (b) Take a lead role in communicating with individuals who are observing or recording regarding any appropriate limitations on their location or behavior. When practical, the encounter should be recorded.
> (c) When practicable, allow adequate time for individuals to respond to requests for a change of location or behavior.
> (d) Ensure that any enforcement, seizure or other actions are consistent with this policy and constitutional and state law.
> (e) Explain alternatives for individuals who wish to express concern about the conduct of department members, such as how and where to file a complaint.

186. The defendants failed to follow their own policy. The Policy specifically contemplates recording from a "sidewalk across the street."  Yet defendants apparently, and unknown to Mr. Eravi, moved to "clear the area" rather than the defendants advising Mr. Eravi "that he/she may continue observing and recording from the sidewalk across the street."

187. Plaintiff Eravi did not interfere with any City Officer's effective communication with a suspect or witness.

188. Plaintiff did not present an undue safety risk to any City Officer.

189. Defendants did not give clear and concise warnings to Mr. Eravi.  Defendants did not warn Mr. Eravi that he would be arrested.

190. The "most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Gonzalez v. Trevino*, 60 F. 4th 906, 907 (5th Cir 2023).  "Here in America, we do not arrest our political opponents." *Frenchko v. Monroe*, No. 4:23-CV-781, 2023 WL 9249834 at *1 (N.D. Ohio Jan. 16, 2023).

191. Each defendant has targeted Mr. Eravi because of his status and viewpoints and have been motivated from their respective animosity and predispositions against Mr. Eravi and his political viewpoints as a basis to retaliate and chill Mr. Eravi' speech.

192. Each defendant was "motivated by improper considerations" such as "the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000).

193. Defendants singled out Mr. Eravi from being present on private property when the defendants allowed other individuals to be present on the same private property.

194. "Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else ... is unreasonable." *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022).

195. The defendants each ratified each confrontation, removal(s), and arrest of Mr. Eravi on private property.  Each made an affirmative approval of those decisions of the defendants described in this Complaint. Each defendant further ratified those decisions by failing to meaningfully investigate and punish the unconstitutional conduct.

196. An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.  *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991).

197. Defendants had a policy or custom of viewpoint discrimination from the failure of the City or the defendant police supervisors to take any remedial steps after the violation. *See Larez; Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

## SECOND CAUSE OF ACTION
### RETALIATION AND RETALIATORY ARREST FOR EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANT OFFICERS)

198. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

199. At the time of the arrest, Plaintiff Eravi was engaged in constitutionally protected activity.

200. Mr. Eravi was on private property lawfully observing and recording his comments about the events as well as the events themselves.

201. Defendant Officers knew that Plaintiff's conduct did not violate Kansas state law.

202. Defendant Officers knew that Plaintiff's conduct was affirmatively protected by federal law.

203. A reasonable inference from Defendant Officers' conduct and statements both preceding and after the arrest is that Defendant Officers arrested Plaintiff as a direct response to numerous things: Mr. Eravi's prior and current news gathering activities, prior reporting of police activities, his complaints, and his presence and recording of the scene.

204. As a result of observing and video recording the defendant Officers conducting their official duties Plaintiff was arrested, incarnated, and prosecuted.

205. As a result of observing and video recording the defendant Officers conducting their official duties the plaintiff was charged:

> "That on or about May 20, 2023, in Douglas County, Kansas, PHILLIP MICHAEL ERAVI did unlawfully, feloniously, and knowingly obstruct, resist, or oppose a person authorized by law to serve process, to-wit: David McShane and/or other Lawrence Police Officers, in the discharge of any official duty, in the case of a felony, a severity level 9 nonperson felony, in violation of K.S.A. 21-5904(a)(3) & (b)(5)(A)."

206. The charge does not identify any specific officer purportedly interfered with, or the specific official duty the officer was allegedly conducting. The charge does not specify any conduct of Mr. Eravi.

207. The defendant Officers' decision(s) to arrest and initiate prosecution against the plaintiff came directly in response to and because of Plaintiff's reasonable exercise of his constitutionally protected rights under the First Amendment.

208. Defendant Officers sought to punish Plaintiff for his many prior actions, including observing and reporting on the scene, as well as video recording.  As a result, the plaintiff suffered monetary damages in attorney fees defending against the prosecution, emotional, other economic, and dignitary injuries.

209. Plaintiff has lost confidence in his ability to assert the rights guaranteed to him the Constitution of the United States of America. Plaintiff fears that officers will continue to retaliate/punish him for asserting his rights in the future.

210. Such actions by Defendant Officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to record police officers engaged in official duties while in public. These deprivations proximately

caused Plaintiff's loss of liberty, emotional distress, and other harms associated with retaliatory arrest.

### THIRD CAUSE OF ACTION
#### 42 U.S.C. §1983 FOURTH AMENDMENT VIOLATION – UNLAWFUL ARREST/FAILURE-TO-INTERVENE
#### (AGAINST ALL DEFENDANT OFFICERS)

211. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

212. The defendants, as well as other reporting officers, claimed Mr. Eravi's post-arrest conduct justified the arrest.  But Mr. Eravi's post-arrest conduct cannot supply the probable cause necessary to initiate the arrest. *See Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.3 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after").

213. The cited arresting officers' post-arrest statements are *post hoc* decision-making which together indicate pretext.

214. Mr. Eravi was present on a public area, if not entirely private property.

215. Defendants knew that the plaintiff's specific conduct did not violate any Kansas or Federal law in lawfully observing or recording their activities.

216. Based on their training regarding First Amendment protections, including the right to record, the defendants each knew that the plaintiff's act of observing and recording the scene and the officers was Constitutionally protected activity.

217. Despite knowing this, the defendants arrested Mr. Eravi in retaliation, claiming pretextually that he was arrested for his own safety.

218. Prior to the arrest, there was no crime committed by Mr. Eravi, no emergency, nor did Mr. Eravi threaten, or pose a threat, to any officer.  It was the defendants who drew attention to Mr. Eravi by shining a light upon him, then creating the scene rather than watching Mr. Eravi from a distance in the darkness or shadows while he recorded the scene.

219. At any time during the interaction with Plaintiff or the subsequent booking process, Defendants Twite, Foster, and Shipley had the opportunity to intervene in Defendant McShane's unlawful arrest of the plaintiff but failed to do so.

220. At any time during the interaction with Plaintiff or the subsequent booking process, Defendant McShane had the opportunity to intervene in use of force and booking of the plaintiff but failed to do so.

221. Instead of intervening to prevent the unlawful arrest of Plaintiff, all the defendant Officers either chose to arrest the plaintiff or participate in that arrest without possessing any information that Mr. Eravi committed a crime.

222. The actions as described herein of Defendant Officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable search and seizure.

## FOURTH CAUSE OF ACTION
### EXCESSIVE FORCE
### (42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANT OFFICERS)

223. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

224. Plaintiff makes alternative excessive force claims. Plaintiff posed no risk of harm to the defendant Officers.

225. Defendant McShane lacked probable cause to approach, stop, or to arrest Mr. Eravi. Any force used by defendants was excessive because the stop and arrest were unlawful and there was no basis for any threat or any use of force. *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022).

226. If a jury finds the arrest unconstitutional, the use of force and the search were unconstitutional. This becomes elements of damages for the § 1983 violation.

227. The unwarranted and unwanted physical interaction was not in furtherance of an arrest but was in furtherance of an inquiry.

228. Alternatively, even if the arrest of Mr. Eravi was supported by probable cause, the force used in effectuating the arrest remains excessive.

229. The force was not reasonably proportionate to the need for that force given the totality of the circumstances facing the defendant Officers prior to that force. There was no physical aggression or resistance shown by Mr. Eravi prior to the use of force. In fact, Mr. Eravi was never attempting to make or continue any contact with any of the defendants but was attempting to stay clear of them and make distance between

himself and them when defendant McShane approached and persisted in his close-proximity tactics.

230. As such, the use of force by the defendants McShane, Foster, and Twite was unjustified, and demonstrated deliberate indifference to his constitutional civil rights.

231. Further, after the unwarranted aggressive grabbing of Mr. Eravi's arms, pain pressure maneuvers, and twisting of fingers, they restrained Mr. Eravi to the ground and restricted his movement.

232. Prior to the excessive use of force, the plaintiff Eravi posed no risk of harm to Defendants McShane, Foster, or Twite.

233. Defendant McShane was at no risk of bodily harm from the unarmed Plaintiff.

234. As such, the use of force upon the plaintiff Eravi was unjustified, constituted an unreasonable and excessive use of force, and demonstrated deliberate indifference to his constitutional civil rights.

235. There was gratuitous use of force by defendants Twite and Foster because Mr. Eravi was compliant when he was told he was under arrest and did not resist the arrest.

236. In addition, without cause or justification all of the defendants, including Defendants Sergeant Meagan Shipley, Lieutenant Mark Unruh, and Major Hayden Fowler, contributed to, coordinated with, or otherwise supported the defendants McShane, Twite, and Foster using excessive force upon the plaintiff Michael Eravi.

237. By supporting, contributing, or otherwise enabling Defendant McShane's actions, the defendant Foster allowed an excessive, unnecessary, and disproportionate use of force to be inflicted upon Plaintiff Eravi.

238. Defendant Foster was therefore malicious, reckless, callous and acted with deliberate indifference to Plaintiff Eravi's rights.

239. All of the defendants failed to issue a warning, was not at risk of harm, and was not in the process of effectuating an arrest as Mr. Eravi was walking back South on the apartment property.

240. Likewise, without cause or justification, the defendant McShane contributed to, coordinated with, or otherwise supported the defendants Twite and Foster use of excessive force upon Plaintiff Eravi.

241. By supporting, contributing, or otherwise enabling Defendant's  actions, Major Hayden Fowler was present and participated in the arrest, shined a light upon Mr. Eravi, encouraged and allowed an excessive, unnecessary, and disproportionate use of force to be inflicted upon the plaintiff Eravi.

242. Major Fowler, along with each of the defendant officers Shipley, McShane, Foster, and Twite were each malicious, reckless, callous and acted with deliberate indifference to Plaintiff's rights.

243. The battery, detention, and arrest of this plaintiff was the result of conduct that was reckless, malicious, and deliberately indifferent to Mr. Eravi, and in depriving him of his constitutional rights.

244. All of the named officers in this Complaint, including the defendant Officers, while acting under color of law as authorized officers and agents of the City of Lawrence and the Lawrence Police Department, and while approaching and confronting Mr. Eravi in purported furtherance of their official duty, caused a constitutional deprivation of the rights of this plaintiff under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

245. The actions alleged in this Complaint directly and proximately resulted in injury to the plaintiff.

246. As a direct result of the grossly negligent misconduct of each defendant as set out in this Complaint and associated deliberate indifference, this plaintiff was injured and is entitled to recover damages flowing from the deprivations of the plaintiff's constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

247. Plaintiff is entitled to attorney's fees expended in this litigation pursuant to 42 U.S.C. Section 1988.

WHEREFORE, Plaintiff demands judgment and compensatory and punitive damages against each Defendant, and in addition demands attorney's fees and costs pursuant to 42 U.S.C. Sections 1983 and 1988 and demands trial by jury on all issues so triable.

## FIFTH CAUSE OF ACTION
### MALICIOUS PROSECUTION UNDER 42 U.S.C. SECTION 1983 AGAINST DEFENDANT OFFICERS

248.  Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

249. Plaintiff was charged with a felony as previously described.

250. After arresting the plaintiff Eravi, each of the defendant Officers caused a judicial proceeding to be commenced against Mr. Eravi by the filing of reports and information in Douglas County Kansas.

251. No reasonably cautious police officer in the position of the Defendant Officers would have believed that Mr. Eravi could be arrested for his own safety or that Mr. Eravi was guilty-in-fact of the crime of felony interference.

252. Said judicial proceeding was instituted by Defendants without probable cause as Mr. Eravi did not commit a crime in the officers' presence or otherwise.

253. A reasonable inference from the lack of probable cause, combined with the defendant Shipley's conduct and testimony given in Mr. Eravi's criminal defense case (that she would have still ordered Mr. Eravi arrested despite Lieutenant Unruh instructing that Mr. Eravi be merely detained), as well as statements made immediately preceding the arrest, during the arrest, and after the arrest, that each of the Officer defendants acted with malice when Mr. Eravi was unlawfully arrested, and initiated the criminal prosecution by booking Mr. Eravi on Saturday, May 20, 2023 at 2:20 a.m., Booking No. 23-01353, offense No. 166983, Statute 16705

(Interference with LEO; unknown circumstance), felony, with a bond amount of $750.00 which was paid by Mr. Eravi.

254. As a result of each of the defendant's respective conduct described in this Complaint, the plaintiff had to endure jail, along with the stress and humiliation of dealing with an unfounded criminal prosecution, multiple unfavorable press coverage, and the incurring of criminal defense attorney fees of Angela Keck, investigator Chalcea Helm, and expert fees of Brent E. Turvey, PhD, a Forensic Criminologist who has made an expert report pertaining to Mr. Eravi's criminal prosecution.

255. The actions as described herein of these defendant officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from wrongful prosecution as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other injuries associated with malicious prosecution.

### SIXTH CAUSE OF ACTION
#### NEGLIGENT FAILURE TO TRAIN AND
#### SUPERVISE UNDER 42 U.S.C. SECTION 1983
#### AGAINST DEFENDANT CITY OF LAWRENCE

256. The plaintiff hereby realleges and incorporates by reference the allegations contained above.

257. All conditions precedent to filing this action have been met by the plaintiff or have been waived by the City of Lawrence and the City of Lawrence Police Department.

258. On May 19 & 20, 2023, the defendant Officers were acting within the course and scope of their employment as City of Lawerence police officers.

259. The responsibilities related to De-Escalation with respect to The Lawrence PD are clearly written and effectively defined in the Lawrence PD Policy Manual.

260. This incident involved the defendants escalating to the third level of force (Empty-Hand Control/ Pain Compliance /Detention and Arrest) without issuing clear verbal commands to Mr. Eravi. There were no attempts to "safely engage in active communication and listening techniques" in order to de-escalate this contact were made.

261. The videos of this incident demonstrate there are no officers across the street on the sidewalk in front of the Apartment complex, which is directly across the street from 1951 Heatherwood Drive. Consequently, Mr. Eravi can be observed walking up that sidewalk unobstructed and unapproached by law enforcement. He can also be observed to be wearing a bright reflective yellow jacket and conspicuously recording activity with his cellphone.

262. The videos of this incident also reveal that defendant McShane lit the plaintiff up like a target, and drew attention to him. This occurred directly across the street from the active shooter who would likely be looking and aiming their firearm in that

direction — in the line of potential fire. It also occurred directly in front of the apartment complex which had not been evacuated.

263. Defendant McShane does not explain to Mr. Eravi exactly what he expected, either leaving or at least be moving. He also agrees that Mr. Eravi is a "free human being." This context clearly implies that the plaintiff Eravi is not committing a crime, is not under arrest, and is not being detained.

264. When defendant McShane radios in "I can't get him to move" McShane approaches the plaintiff Eravi as he was walking back South and immediate grabs him by the arms to forcibly hold him. This results in a struggle. Officer McShane does this without issuing any coherent commands, instructions, or rationale — immediately after indicating that Mr. Eravi was not committing any violations.

265. Multiple Officers swarm the location to help forcibly hold and handcuff the Defendant. During this process, Officer Twite turns off his body worn camera (BWC) audio inexplicably, rapidly approaches to insert himself into the arrest, and uses pain compliance against Mr. Eravi. Defendant Twite can also be observed pulling the Defendant's fingers back to induce extreme pain.

266. During this sudden law enforcement swarm of the Defendant, an Officer can be heard screaming expletives at Mr. Eravi in a verbally threatening manner.

267. The communications between Officer McShane, Sgt. Megan Shipley, and Lt. Mark Unruh indicate strong contradictions with respect to how to handle the plaintiff's presence at the scene. Officer McShane has indicated to the plaintiff Eravi that he is free and not being detained; Lt. Unruh has instructed that Mr. Eravi should

simply be detained; and Sgt. Shipley instructs Officer McShane to arrest the plaintiff despite her superior's statement. At no time is Mr. Eravi given clear orders to respond to, advised of the situation, or instructed that he has committed a crime and is being placed under arrest.

268. Rather, the physical restraint and sudden officer swarm comes without any attempt to communicate clear lawful orders or information to this plaintiff. This was all done in the context of "officer rage" according to the expert report of Dr. Turvey.

269. During this incident, multiple individuals were walking in the same area as the plaintiff and the parking areas of the Apartment complex, without confrontation or incident. Law enforcement officers can even be observed engaging in cordial / professional conversations with at least one of these individuals. This indicates that citizen journalist Phillip Michael Eravi was targeted for approach at the scene because of who he was and what he was doing (observing and video recording the activities of law enforcement and not showing them sufficient deference).

270. Given that radio traffic named Mr. Eravi as the approaching individual from a distance, these Lawerence City Officers were not so much distracted as they were willing spectators watching their officers "take care of business" regarding this unwelcome videographer and critic of police activities.

271. The hyper-escalation of use of force in this case occurred without clear communication between Officers and Mr. Eravi; and without clear and consistent communication or messaging within the command structure at the scene. It also occurred without consideration of de-escalation.

272. The actions against the plaintiff Eravi was selective – targeted solely towards Mr. Eravi when others doing the same things were not. The hyper-escalation of force, sudden swarming, and screaming of expletives was a result of the personal animosity towards Phillip Michael Eravi, by these Lawrence Police Department members in general; and at least the defendant Officer Twite in specific.

273. With respect to the Lawrence Police Department Policy Manual, the following negligent failures by members of the Lawrence Police Department are evident:

- Negligent failure to secure the scene and establish a viable security perimeter.
- Negligent failure to protect including Eravi and other citizens from entering and exiting the area.
- Negligent failure to effectively communicate with other agencies.
- Negligent failure to communicate internally at the scene.
- Negligent failure to protect Mr. Eravi once he was forcibly detained.

274. Responsibilities related to establishing and securing the scene perimeter with respect to the Lawrence Police Department Critical Response Team (CRT) are clearly written and effectively defined in the Lawrence PD Policy Manual (pp.202-203). They include: "(c) Evacuate or provide safety instructions to other people in the zone of danger. (d) Establish an inner and outer perimeter. (e) Establish a command post outside of the inner perimeter."

275. No inner and outer perimeters were physically established and properly manned despite the pretextual law enforcement reports, sworn affidavits, and testimony by the defendants to the contrary.  If there were any inner and outer perimeters they were not clearly communicated or established by law enforcement at the scene of this shooting.

276. None of the residents and civilians in the area were evacuated or properly notified of the danger in the neighborhood. Rather some were apparently told or suggested to leave or shelter in place (yet still directly in the line of fire of the shooter across the street or next door).

277. These individuals that the defendants claimed were in a zone of danger were not evacuated; not provided clear or consistent safety instructions; and not instructed on the hazards of entering or leaving the neighborhood.

278. As far as Command Scene Responsibilities, the Lawrence PD CRT policies are clearly written and effectively defined in the Lawrence PD Policy Manual (pp.202-203). They also include: 404.7.4 ON-SCENE COMMAND RESPONSIBILITIES.

279. Upon arrival of the CRT at the scene, the "Incident Commander shall brief the CRT Commander and team supervisors. Once the CRT Commander authorizes deployment, the CRT Commander or the authorized designee will be responsible for the tactical response and negotiations. The Incident Commander shall continue to supervise the command post operation, outer perimeter security, evacuation and media access and will support the CRT. The Incident Commander and CRT Commander or the authorized designee shall maintain direct communication at all times."

280. While the CRT Commander, Sgt. Shipley, and Lt. Unruh were in communication, these communications were apparently garbled, ineffective, and ignored with respect to how to respond to Mr. Eravi's presence. Specifically, Sgt.

Shipley testified under oath in Mr. Eravi's criminal proceeding that even if she had clearly understood the orders from her superiors, she would have ignored them.

281. The CRT Commander, Sgt. Shipley, was distressed over the possibility of insufficient personnel responding to the scene. However, Maj. Fowler can be heard on Lt. Unruh's BWC stating: "We have plausible deniability in place. Instead of calling in people that need not be here, I sent them a text that hopefully will not wake them, so I can say I notified."

282. In other words, Major Fowler knows the Police Department did not take the required steps to call in extra personnel, or properly notify other team members within their agency, to ensure an informed response to the unfolding crisis. Rather, they were concerned more with creating "plausible deniability" for their decisions that evening at the highest level of command.

283. The City and its Police Department failed to properly train and supervise police officers in how to handle Mr. Eravi's presence at the scene observing and recording, as well as the securing of a crime scene and the use of force.

284. The named officers in this Complaint breached the duties owed to this plaintiff when they each failed to adhere to accepted law enforcement standards and practices for detaining and arresting subjects.

285. The City failed to properly train and supervise its officers as to its Policy on recording police activity.

286. The City failed to properly train and supervise its officers as to its Policy on alternative non-violent tactics to decrease the intensity of a situation, improve

decision-making, improve communication, reduce the need for force, and increase voluntary compliance.

287. The City has ratified and approved the actions of each of the defendants as the City Police Department and these defendants continue defending and justifying all of that conduct in Mr. Eravi's criminal proceedings.

288. Defendant City of Lawrence and its Police Department owed Plaintiff, as well as all citizenry, a duty of care to hire and retain and supervise competent, law-abiding officers, as well as to enact policies that ensure that officers do not arrest citizens because of bias or without probable cause or use excessive force against civilians.

289. Defendant City of Lawrence breached its duty of care to Plaintiff by hiring and retaining, and improperly supervising each of the named City Officers in this Complaint.

WHEREFORE as a proximate and direct result of the negligence of the City of Lawrence, Plaintiff suffered severe mental and emotional distress arising from fear of incarceration and the humiliation, shame, embarrassment, and disgrace from detention, interrogation, arrest, booking, fingerprinting, and search of his body, bodily injury resulting in physical pain and suffering and diminished health, mental pain and suffering, loss of the capacity for the enjoyment of life, loss of earnings, and diminution and loss of the ability to earn money which are either permanent or continuing to this day and are likely to continue into the future.

67

AA73

## PRAYERS FOR RELIEF

290. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to petition, associated, and free speech in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution. Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

291. That as a direct and proximate result of the aforementioned unlawful conduct and omissions of each of the defendants, Plaintiff suffered fear, pain, anguish, and the following damages: a. shock, fright, anxiety, mental distress, annoyance, vexation, and humiliation suffered by plaintiff; b. loss of freedom; c. pain and suffering during the arrest and confinement; d. isolation from friends and family; e. loss of dignity; f. loss of reputation; g. Loss of enjoyment of life; h. Compensatory and punitive damages; and any and all other damages otherwise recoverable under USC Section 1983 and Section 1988; and punitive damages in the individual capacity of each Defendant.

292. Mr. Eravi' First Amendment rights were callously violated by each defendant sued in their individual capacity.

293. Mr. Eravi' First Amendment rights were maliciously violated by each defendant sued in their individual capacity.

294. Mr. Eravi' First Amendment rights were wantonly violated by each defendant sued in their individual capacity.

295. Mr. Eravi' First Amendment rights were oppressively violated by each defendant sued in their individual capacity.

296. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Mr. Eravi individually, or toward persons in one of more groups or categories of which Mr. Eravi is a member.

297. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one of more persons, including Mr. Eravi.

298. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Mr. Eravi with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Mr. Eravi.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, punitive damages against the individual Defendants, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees, as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Verification of Complaint

I, Michael Eravi, am the plaintiff in the above-captioned matter.  I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Date: 17 May 2024

By: _____
Michael Eravi

71

AA162

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**PHILLIP MICHAEL ERAVI,**

                              **Plaintiff**,

**v.**                                                          Case No. 24-4042-DDC-RES

**CITY COMMISSION OF LAWRENCE,
KANSAS, et al.,**

                              **Defendants**.

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Phillip Michael Eravi, a citizen journalist in Lawrence, Kansas, asks the court to

hold local police officers and the City Commission of Lawrence liable for allegedly violating his

constitutional rights.

In the early morning hours of May 20, 2023, plaintiff arrived on the scene of a police

stand-off. An active shooter was holed up in the shooter's residence. Police were trying to coax

the suspect out while keeping the surrounding neighborhood safe. Plaintiff contends he wanted

to video record the police performing their duties—a right protected by the First Amendment.

Police, however, viewed plaintiff as interfering and distracting them from their duties. They

allegedly couldn't get him to stop moving near the suspected shooter's residence. And so, the

officers arrested him for interference with law enforcement, a felony under Kansas law. Plaintiff

asserts the arrest was retaliatory. He also alleges that the officers used excessive force, failed to

intervene, and, later, were responsible for a malicious prosecution against him. The officer

71

AA162

**72**                                                                   **AA163**

defendants, plaintiff contends, violated his constitutional rights under color of state law, contravening 42 U.S.C. § 1983.

Plaintiff also asserts § 1983 claims against the City Commission of Lawrence for prior restraint, a retaliatory policy of prohibiting exercise of protected speech, and negligent failure to train and supervise. He contends that Lawrence Police Department policy about recording law enforcement activity functions as a prior restraint of protected speech. He also alleges that the officer defendants used the city's policy to single him out in retaliation for his status and viewpoints—making it a retaliatory policy. Finally, he alleges the city negligently failed to train and supervise based on failure to secure the scene, de-escalate the situation, communicate clearly, handle plaintiff's presence properly, and protect plaintiff once he was arrested.

The officer defendants move to dismiss, asserting a qualified immunity defense. Doc. 31. The court concludes, even when taking plaintiff's well-pleaded allegations as true, that plaintiff fails to shoulder his burden once qualified immunity is invoked. Namely, he fails to show that any constitutional violation occurred. The court thus dismisses all claims against the officer defendants as barred by qualified immunity. The City Commission of Lawrence also moves to dismiss for failure to state a claim. Doc. 7. The court concludes that plaintiff's § 1983 claim fails because the city's recording policy isn't a prior restraint; it imposes reasonable restrictions; it isn't retaliatory; and plaintiff didn't allege sufficient facts to support his failure-to-train liability theory. So, the court dismisses the claims against the city, as well.

**I.     Background**

The following facts come from plaintiff's Complaint (Doc. 1). The court accepts plaintiff's "'well-pleaded facts as true, view[s] them in the light most favorable to the Plaintiff, and draw[s] all reasonable inferences from the facts in'" plaintiff's favor. *Audubon of Kan., Inc.*

**72**                                    2                                **AA163**

*v. U.S. Dep't of Interior*, 67 F.4th 1093, 1108 (10th Cir. 2023) (brackets omitted) (quoting

*Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

### *The Parties*

Plaintiff Phillip Michael Eravi is a "citizen journalist" who operates a YouTube channel

called "Lawrence Accountability."  Doc. 1 at 1, 9 (Compl. ¶¶ 1, 38).  His channel is a "local and

independent media source focused on accountability and governmental oversight." *Id.* at 15

(Compl. ¶ 69).  Plaintiff is well-known in Lawrence, Kansas for his civil activism and reporting

on police activities. *Id.* at 1 (Compl. ¶ 1).  He has reported on numerous crime scenes and

Lawrence police officers recognize him. *Id.* at 20 (Compl. ¶¶ 91, 92).

Defendants include the City Commission of Lawrence, Kansas—the governing body of

the Lawrence City Police Department—and four officer defendants. *Id.* at 1 (Compl.).  The

officer defendants are Lawrence police officers:  Austin Twite, Grant Foster, Meagan Shipley,

and David McShane. *Id.* at 11 (Compl. ¶¶ 44–47).  During the law enforcement incident

described below, McShane, Twite, and Foster physically restrained and arrested plaintiff. *Id.* at

39 (Compl. ¶¶ 149, 152).  Shipley was the designated leader of the team responding to the

incident. *Id*. at 21 (Compl. ¶ 96).  Before the night in question, plaintiff had a run-in with Twite,

in which Twite purportedly pushed plaintiff backwards while he was handcuffed. *Id.* at 46

(Compl. ¶ 175).  Plaintiff filed a complaint with Twite's supervisors as a result. *Id.* at 16

(Compl. ¶ 73).

### *The Shooting Incident and Subsequent Police Activity*

Around 10:37 PM on May 19, 2023, Lawrence police officers, including the four officer

defendants, responded to a reported shooting between neighbors in the 1900 block of

Heatherwood Drive in Lawrence, Kansas. *Id.* at 12, 17 (Compl. ¶¶ 54, 79).  The officers

**74**    AA165

believed that an armed shooter was inside one of the homes.  *Id.* at 12–13 (Compl. ¶ 56).  The

Lawrence Police Department Critical Response Team parked an armored vehicle in the shooting

suspect's driveway and attempted, to no avail, to coax the shooter out of the residence using a

loudspeaker.  *Id.* at 12–13 (Compl. ¶ 56).  The garage door and interior house door both were

open, making vigilant, continuous coverage of the opened garage critical.  *Id.* at 13 (Compl.

¶ 59).  Shipley was the designated leader of the "contact team" stationed in the shooting

suspect's driveway.  *Id.* at 21 (Compl. ¶ 96).  Officers advised neighboring residents to evacuate

or shelter in place because of danger to the public.  *Id.* at 13–14 (Compl. ¶ 61).  Shipley reported

that the team "deployed to the outside of the armored vehicle" around 1:10 AM.  *Id.* at 21

(Compl. ¶ 96).  This "stand off" lasted approximately five hours.  *Id.* at 13, 17 (Compl. ¶¶ 57,

81).  At 4:00 AM on May 20, 2023, law enforcement officers entered the residence and

apprehended the shooting suspect, who was armed at arrest.  *Id.* at 13 (Compl. ¶ 57).

### *Plaintiff's Reporting Activity and Police Contact*

At around 1:50 AM on May 20, 2023, officers on the scene observed plaintiff

approaching the area on foot.  *Id.* at 21, 22 (Compl. ¶¶ 95, 100).  Plaintiff was video recording

his surroundings on his cell phone.  *Id.* at 47, 61 (Compl. ¶¶ 179, 261).  Approaching from the

south, plaintiff saw a police vehicle blocking vehicle entry into the area, but sidewalks were not

blocked off from pedestrian traffic.  *Id.* at 17, 19 (Compl. ¶¶ 83, 88).  Officers hadn't marked a

visible perimeter with security tape and weren't patrolling the perimeter.  *Id.* at 14, 18 (Compl.

¶¶ 64, 85).  Plaintiff walked north on Heatherwood Drive towards the shooting suspect's

residence and armored vehicle but remained on the east side of the street—opposite from the

residence and armored vehicle.  *Id.* at 22–23 (Compl. ¶ 101).

**74**    AA165

As plaintiff walked north along a sidewalk, he saw McShane and Foster ahead, also on the east side of Heatherwood Drive. *Id.* at 24, 29 (Compl. ¶¶ 103, 113). McShane "spotlighted," or shined his flashlight at plaintiff. *Id.* at 22, 24 (Compl. ¶¶ 101, 104). McShane apprehended plaintiff as they approached each other, physically meeting nearly across the street from the shooting suspect's residence and the armored vehicle. *Id.* at 23, 26 (Compl. ¶¶ 101, 107). The Complaint includes quoted dialogue between plaintiff and McShane, apparently taken from body cam footage. *See id.* at 26, 29 (Compl. ¶¶ 107, 111). After an initial interaction where McShane told plaintiff "You can't be right here," the dialogue continued as follows:

| | | |
|---|---|---|
| Eravi | (1:04): | Don't touch me. |
| McShane | (1:05): | If you want to walk, walk. But I have to cover you. Let's go. |
| Eravi | (1:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (1:16): | You live here? |
| Eravi | (1:16): | You need to leave me alone. |
| McShane | (1:19): | Come on. Just get inside if you live here. |
| Eravi | (1:20): | You need to leave me alone. |
| McShane | (1:21): | Sir, I need you to leave. |
| Eravi | (1:23): | You need to leave me alone. |
| McShane | (1:24): | I will. Just keep walking. |
| Eravi | (1:27): | I'm a free human being. You need to leave me alone. |
| McShane | (1:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (1:30): | Leave me alone. |
| McShane | (1:30): | I'll walk with you. |
| Eravi | (1:31): | Leave me alone. |
| McShane | (1:34): | I can't get him to move. |
| Eravi | (1:37): | You motherfuckers woke me up. Leave me alone. You woke me up. |
| McShane | (1:39): | What's your name? |
| Eravi | (1:40): | You woke me up. You got me out here. Leave me alone. |
| McShane | (1:42): | Okay. Come on. |
| Eravi | (1:43): | Get off me, dude. |

*Id.*

McShane allegedly followed plaintiff around "vaguely herding" plaintiff "to an unknown destination." *Id.* at 16–17 (Compl. ¶ 77). Plaintiff attempted to distance himself from McShane

by walking east towards some adjacent apartments, then turning north, then walking back south. *Id.* at 28 (Compl. ¶ 111). McShane's supervisor, Shipley, was across the street, standing behind the armored vehicle. *Id.* at 22 (Compl. ¶ 100). As plaintiff was walking south, McShane reported to Shipley that he "can't get him to move." *Id.* at 37 (Compl. ¶ 145). Shipley's superior, Lieutenant Unruh, captured this dialogue on his body cam:

| | |
|---|---|
| Unruh: | Yeah, we got units going down there to make contact. |
| Shipley: | Okay, he's continuing to come closer. |
| Unruh: | Yep, we got guys right there walking towards him. I don't know if that's our subject or not. |
| Shipley: | He can't be right behind the armor. |
| McShane: | I can't get him to move. |
| Shipley: | Just arrest him. |
| Unruh: | Go ahead and detain him. |

*Id.* at 32 (Compl. ¶ 119).

### The Arrest

After Shipley's instruction, McShane, Foster, and Twite physically restrained plaintiff. *Id.* at 39 (Compl. ¶ 149). They "each"[1] used painful techniques including "body and neck restraints, bending of the wrists and twisting of" plaintiff's fingers. *Id.* These physical restraint methods caused injury and pain to plaintiff. *Id.* None of the arresting officers told plaintiff he was under arrest until about thirty seconds after they began physically restraining him. *Id.* at 39, 45 (Compl. ¶¶ 151, 172). Plaintiff alleges that, before the arrest, no officer told him that he was in danger, in the line of fire, or in a crime scene perimeter. *Id.* at 33 (Compl. ¶ 124). At the time of the arrest, the following dialogue occurred between plaintiff and three officers:

| | | |
|---|---|---|
| Zarnowiec | (2:09): | You're under arrest right now. |
| Eravi | (2:19): | Name. |
| Zarnowiec | (2:19): | Okay? |

---

[1]     The Complaint does not specify which officer defendant used which restraint technique. *See* Doc. 1 at 16 (Compl. ¶ 74) ("Mr. Eravi was forcefully moved around by the defendant officers using pain compliance tactics."); *id.* at 39 (Compl. ¶ 149) ("Mr. Eravi repeatedly visibly and orally expressed pain where the defendants were each intentionally using techniques that were purposeful to cause Mr. Eravi pain including body and neck restraints, bending of the wrists and twisting of Mr. Eravi's fingers.").

77

AA168

| McShane | (2:19): | It's Officer McShane. |
| Eravi | (2:20): | Name. |
| Zarnowiec | (2:20): | Put your hands behind your back.  Okay? |
| Eravi | (2:21): | Why am I under arrest? |
| Foster | (2:22): | For interfering, Mike. |
| Eravi | (2:26): | Dude, you guys fucking woke me up in the middle of the fucking night. |
| Zarnowiec | (2:29): | I just . . . pulled up to this, man. |
| Eravi | (2:30): | With all your fucking sirens and shit, dude. |
| Zarnowiec | (2:32): | All I know is they said that you're under arrest for interfering. |

*Id.* at 41 (Compl. ¶ 153).

After plaintiff was arrested, non-defendant Officer Fowler informed plaintiff that there was "a complex situation going on[,]" that plaintiff was "directly in the line of fire[,]" and that the officers had tried to get plaintiff to leave the area, but he refused.  *Id.* at 42 (Compl. ¶ 154) (quoted dialogue between plaintiff and Fowler).  Defendants later asserted another reason for the arrest was that "they were attempting 'service of process.'"  *Id.* at 29 (Compl. ¶ 112).  Plaintiff alleges that no "purported 'service of process' to anyone was occurring at the time Mr. Eravi was confronted and later arrested."  *Id.* at 42 (Compl. ¶ 157).  Plaintiff alleges that other individuals were outside in the area at the time, but officers didn't confront or arrest them.  *Id.* at 42 (Compl. ¶ 156).

### Misleading, False Reports

The Complaint outlines alleged inconsistencies or omissions between the events and the police reports written by Twite, Foster, Shipley, and McShane.  *See id.* at 29 (Compl. ¶ 113) (Twite); *id.* at 30 (Compl. ¶ 115) (Foster); *id.* at 33 (Compl. ¶ 123) (Shipley); *id.* at 33 (Compl. ¶ 122) (McShane).  It also outlines alleged falsehoods or inconsistencies in Shipley's affidavit later used to charge plaintiff.  *Id.* at 43–46 (Compl. ¶¶ 160–74).  Alleged falsehoods include, for example, that officers had acquired a search warrant to enter the shooting suspect's home "during the alleged incident."  *Id.* at 43 (Compl. ¶ 161).  But officers didn't serve the warrant

77

AA168

until "well after" plaintiff's arrest. *Id.* (Compl ¶ 162). Plaintiff was charged with a felony under

Kan. Stat. Ann. §§ 21-5904(a)(3) & (b)(5)(A) for "unlawfully, feloniously, and knowingly

obstruct[ing], resist[ing], or oppos[ing] a person authorized by law to serve process[.]" *Id.* at 52

(Compl. ¶ 205).

## II.     Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a

claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a

Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895

F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the

factual allegations in the complaint are true, but it is "'not bound to accept as true a legal

conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it

demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.*

(quoting *Twombly*, 550 U.S. at 555).

79

AA170

### III.    Officer Defendants' Motion to Dismiss (Doc. 31)

Plaintiff brings four claims against the four police officer defendants, all for allegedly violating 42 U.S.C. § 1983.  Plaintiff alleges retaliatory arrest (Count II), failure to intervene (Count III), excessive force (Count IV), and malicious prosecution (Count V).  Each officer defendant asserts the defense of qualified immunity.  The court begins with an overview of the law governing § 1983 claims and qualified immunity, before applying that law to each of plaintiff's four claims individually.

#### A.    Section 1983

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted).  A plaintiff may assert a § 1983 claim against either a municipality or an individual.  *See Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (permitting § 1983 suit for policies and practices of municipal police department), *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity).  As a defense against a § 1983 claim, an individual defendant may assert qualified immunity.  *Id.* at 1266.  The court outlines the broad contours of the qualified immunity defense, next.

#### B.    Qualified Immunity

"A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show 'both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation.'"  *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quoting *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009)).  The "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

79

AA170

reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Regardless of the "conduct at issue, Defendant is nonetheless entitled to qualified immunity unless Plaintiff has carried her burden of showing the law was clearly established." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020).  Indeed, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (internal citation and quotation marks omitted).  In such a situation, "'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed." *Losee v. Preece*, No. 2:18-CV-195, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A court has discretion to determine which of these two prongs it should address first "'in light of the circumstances in the particular case at hand.'" *Harris v. Mahr*, 838 F. App'x 339, 342 (10th Cir. 2020) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1263 (10th Cir. 2017)).  Here, the court's analysis begins—and ends—with the first prong, *i.e.*, whether a constitutional violation occurred.  The court addresses each of the four alleged constitutional violations, in turn, below, starting with retaliatory arrest.

### C.    Retaliatory Arrest

Plaintiff alleges that the officer defendants arrested him while he was engaged in a constitutionally protected activity, namely observing and video recording the officer defendants conducting their official duties.  Doc. 1 at 51 (Compl. ¶¶ 199, 204).  And he alleges his arrest was retaliatory.  Officers allegedly retaliated against plaintiff for his "prior and current news gathering activities, prior reporting of police activities, his complaints, and his presence and recording of the scene." *Id.* (Compl. ¶ 203).  In short, plaintiff contends that the officers' arrest "came directly in response to and because of [p]laintiff's reasonable exercise of his

constitutionally protected rights under the First Amendment" including "the right to record police officers engaged in official duties while in public." *Id.* at 52 (Compl. ¶¶ 207, 210). Plaintiff also asserts that he "fears that officers will continue to retaliate/punish him for asserting his rights in the future." *Id.* (Compl. ¶ 209).

To assert a First Amendment retaliation claim, plaintiff must allege:  (1) he "was engaged in constitutionally protected activity"; (2) defendants' "actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) defendants' "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotation marks and citation omitted).  "In addition to the three *Worrell* elements, a First Amendment retaliation claim based on a false arrest requires a separate 'threshold showing'—generally, a plaintiff must show a false arrest." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1227 (10th Cir. 2020) (citing *Nieves v. Bartlett*, 587 U.S. 391, 407–08 (2019)).  The "'plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.'" *Id.* (quoting *Nieves*, 587 U.S. at 402).

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (citation and internal quotation marks omitted).  The dispositive question turns on "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Id.* at 896–97 (internal quotation marks and citation omitted).

82

AA173

Here, the officer defendants' motion targets this threshold probable cause requirement. According to the officer defendants, the Complaint reveals that probable cause to arrest plaintiff existed. Doc. 32 at 9. So, plaintiff fails to shoulder his burden at prong one—showing that a constitutional violation occurred—and qualified immunity thus applies to bar this claim. *Id.* at 11. Specifically, the officer defendants contend that the Complaint provides "ample cause for Plaintiff's arrest for interference which has nothing to do with the exercise of his First Amendment rights." *Id.* at 9. They argue plaintiff interfered with law enforcement because he "failed to comply with lawful orders." *Id.* That is, he "continued to walk in and around an active police situation[,]" ignoring McShane's instruction to "get inside if he lived there and otherwise he needed to leave and keep walking." *Id.* at 10.

Plaintiff's Response argues that there "was no 'lawful order' that was disobeyed that merited probable cause for arrest." Doc. 34 at 3. Instead, plaintiff argues, the Complaint demonstrates that McShane permitted plaintiff to walk and promised plaintiff protection, *i.e.*, that McShane would "cover him." *Id.* at 5 (citing Doc. 1 at 33–34 (Compl. ¶¶ 126–30)). So, plaintiff concludes, there "can be no probable cause to arrest based upon compliance with police guidance." *Id.* at 6.

Kan. Stat. Ann. § 21-5904(a)(3) defines interference with law enforcement to include "knowingly obstructing, resisting or opposing any person authorized by law to serve process . . . in the discharge of any official duty." To commit the offense, the person arrested must know that an individual is a law enforcement officer, the officer is carrying out an official duty, and defendant knowingly and willfully obstructs or opposes the officer. *State v. Brown*, 387 P.3d 835, 848 (Kan. 2017). Disobedience of a lawful order qualifies as interference with law enforcement that would support probable cause. *See United States v. Mosley*, 743 F.3d

82

AA173

1317, 1330 (10th Cir. 2014) ("Defendant's failure to comply with this lawful order gave the officers probable cause to arrest him at least for the Kansas criminal offense of 'interference with law enforcement.'").

But disobedience isn't the only way a person can commit interference. A person can obstruct an officer by resisting or passively impeding an officer while the officer carries out an official duty. *Brown*, 387 P.3d at 849 (citations omitted). Any such act "'must have substantially hindered or increased the burden of the officer in carrying out his official duty.'" *Id.* (quoting *State v. Parker*, 690 P.2d 1353, 1362 (Kan. 1984)). Acts that cause officers to worry about safety substantially hinder an officer carrying out his duties. *See id.* (holding that a jury could convict a defendant of interference with law enforcement when he hid in a "basement from officers who identified themselves and ordered him to come out" for five to 10 minutes because the defendant "created an immediate safety issue for both the officers and [the defendant]").

Here, the Complaint alleges facts suggesting plaintiff committed interference in two ways: disobedience and hindering an officer with safety concerns. *First*, take disobedience of a lawful order. In his Response to defendants' motion, plaintiff argues that McShane didn't give any commands. Doc. 34 at 5. Instead, he only granted plaintiff permission to walk and promised to cover plaintiff. *Id.* (citing Doc. 1 at 33–34 (Compl. ¶¶ 126–30)). But plaintiff's Complaint alleges otherwise. McShane made at least two imperative statements to plaintiff while attempting to distance plaintiff from the active shooter area: "Just get inside if you live here" and "Sir, I need you to leave." Doc. 1 at 29 (Compl. ¶ 111). What's more, McShane's alleged permission to walk and promise of cover, in context, are akin to commands as well— intended to accomplish the same purpose as the imperative statements—removal. To wit:

McShane        (1:05): If you want to walk, walk. But I have to cover you. Let's
                       go.

| Eravi | (1:09): You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (1:16): You live here? |
| Eravi | (1:16): You need to leave me alone. |
| McShane | (1:19): Come on. Just get inside if you live here. |
| Eravi | (1:20): You need to leave me alone. |
| McShane | (1:21): Sir, I need you to leave. |
| Eravi | (1:23): You need to leave me alone. |
| McShane | (1:24): I will. Just keep walking. |
| Eravi | (1:27): I'm a free human being. You need to leave me alone. |
| McShane | (1:27): I agree. You are. Keep walking, please. Come on. |
| Eravi | (1:30): Leave me alone. |
| McShane | (1:30): I'll walk with you. |
| Eravi | (1:31): Leave me alone. |
| McShane | (1:34): I can't get him to move. |

*Id.* McShane repeatedly instructs plaintiff to walk or keep walking. In context, however, plaintiff's pleading makes clear that the officer didn't permit plaintiff to wander around the active shooter area or remain in proximity to the suspected shooter's residence. He wanted to clear plaintiff out of that space. His admonitions to "keep walking" sought to accomplish that end.

Officer McShane's inability to get plaintiff to move led to plaintiff's arrest, as demonstrated by the next chunk of dialogue alleged by plaintiff in his Complaint:

| Unruh: | Yeah, we got units going down there to make contact. |
| Shipley: | Okay, he's continuing to come closer. |
| Unruh: | Yep, we got guys right there walking towards him. I don't know if that's our subject or not. |
| Shipley: | He can't be right behind the armor. |
| McShane: | I can't get him to move. |
| Shipley: | Just arrest him. |
| Unruh: | Go ahead and detain him. |

*Id.* at 32 (Compl. ¶ 119). Immediately after McShane identified his inability to clear plaintiff out of the area, superior officers instructed McShane to arrest or detain him. The dialogue establishes that plaintiff's physical presence near the armored vehicle and McShane's inability to get him to clear out of the area led to plaintiff's arrest.

AA176

Nowhere does the dialogue alleged in the Complaint reference plaintiff's recording of police activities. And the right to film police while they're performing their duties is subject to time, place, and manner restrictions, anyway. *Irizarry v. Yehia*, 38 F.4th 1282, 1292 n.10 (10th Cir. 2022) (explaining that no time, place, and manner restrictions apply when the recording "'does not interfere with the police officers' performance of their duties'" (quoting *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011)). Here, plaintiff didn't film the officers "from a comfortable remove." *Glik*, 655 F.3d at 84 (quotation cleaned up). He was moving to and fro in the middle of an ongoing crime scene with an active shooter. *See* Doc. 1 at 28 (Compl. ¶ 111) (explaining plaintiff's movements near the shooter's residence, first walking east, then turning north, then turning back south). Plus, dialogue concurrent with plaintiff's arrest identifies interference with law enforcement as the reason for his arrest. *Id.* at 41 (Compl. ¶ 153) (reciting officers' answer to plaintiff's question about reason for arrest as "For interfering, Mike. . . . All I know is they said that you're under arrest for interfering.").

This dialogue establishes McShane gave lawful orders, attempting to remove plaintiff from the area because he was interfering with police officers' efforts to perform their duties. And plaintiff didn't comply. Plaintiff's disobedience provides probable cause to arrest plaintiff for interference.

But even if the court concluded McShane didn't command plaintiff at all, probable cause for interference still inheres. The Complaint alleges at-the-scene concerns by law enforcement about plaintiff's safety. *Id.* at 29 (Compl. ¶ 111) (capturing body cam dialogue of McShane saying to plaintiff, "I have to cover you" and "Just get inside if you live here."); *id.* at 4 (Compl. ¶ 12) (quoting incident report of Officer Pate—not a defendant—who explained that "officers approached [plaintiff] . . . to direct him to leave the area as it was not safe"). And the

Complaint recites allegations about the severity of the active threat, suggesting officers' safety concerns were justified. *See id.* at 13 (Compl. ¶ 58) (explaining active shooter suspect was inside residence, refusing to exit, armed, had fired several rounds at his neighbor, and had access to AR-15 type rifle); *id.* (Compl. ¶ 59) (noting suspect's residence had garage door and interior door open, requiring constant coverage); *id.* at 13–14 (Compl. ¶ 61) (identifying neighborhood advisory to either evacuate or shelter in place). The Complaint alleges plaintiff's continued movement in proximity to the active shooter's residence. *See id.* at 28 (Compl. ¶ 111) (explaining that plaintiff walked east, then turned north, then walked back south). And officers' incident reports identified plaintiff as a person distracting them from their duties. *See id.* at 4 (Compl. ¶ 12) (quoting Officer Pate's incident report as noting that his "attention was divided"); *id.* (Compl. ¶ 13) (quoting McShane's incident report as claiming that "it was clear that several tactical officers were distracted and interfered with by [plaintiff's] actions"). Probable cause for interference thus existed based on plaintiff hindering officers from carrying out their duties because of their concerns for his safety. *See Brown*, 387 P.3d at 849. A "reasonable officer would have believed that probable cause existed to arrest" plaintiff for interference with law enforcement "based on the information possessed by the arresting officer." *Valenzuela*, 365 F.3d at 896–97 (internal quotation marks and citation omitted).

Plaintiff alleges that the reasons for his arrest were "pretextual" and "it was really because this plaintiff had been a long standing public irritant to this police force." Doc. 1 at 2, 5 (Compl. ¶¶ 3, 20). He contends officers' post-arrest statements justifying the arrest "are *post hoc* decision-making which together indicate pretext." *Id.* at 53 (Compl. ¶ 213). But the Complaint's allegation of pretext is no better than conclusory. *See Iqbal*, 556 U.S. at 678. As discussed above, officers made statements contemporaneous with the arrest indicating

interference supplying probable cause at the time, not post hoc. *See* Doc. 1 at 41 (Compl. ¶ 153) (reciting body cam dialogue explaining to plaintiff he was under arrest for interfering).

Plaintiff also contends that officers provided multiple, purportedly conflicting reasons for his arrest—including moving plaintiff out of harm's way, behavior distracting to officers, refusing to leave the area, and ignoring officer commands. *Id.* at 2, 5–6 (Compl. ¶¶ 2, 20–21). But the officers' multiple justifications don't undermine probable cause. *First*, they don't conflict with one another—all can exist simultaneously. *Second*, each reason is consistent with the crime of interference. *See Brown*, 387 P.3d at 849 (explaining safety concerns interfere with law enforcement—like the need to move plaintiff out of harm's way here); *see id.* (finding passively impeding an officer interferes with law enforcement—like the distracting behavior here); *see Mosley*, 743 F.3d at 1330 (noting that failing to comply with lawful orders constitutes interference—like refusing to leave the area and ignoring officer commands here). Plaintiff hasn't persuaded the court that the officer defendants citing multiple reasons for plaintiff's arrest undermines probable cause.

So, plaintiff hasn't crossed the threshold of a retaliatory arrest claim because he hasn't shown an absence of probable cause.[2] Without shouldering his burden to show a constitutional violation has occurred, plaintiff's claim can't weather the officer defendants' qualified immunity

---

[2]    Plaintiff makes a passing argument that the probable cause requirement doesn't apply if similarly situated individuals—persons not engaged in protected speech—weren't arrested. Doc. 34 at 10, 10 n.8. The court addresses plaintiff's allegations regarding these other individuals in the context of plaintiff's retaliatory policy claim, below. *See* IV.B. The gist of the court's conclusion there is that plaintiff's allegations of similarly situated individuals are conclusory. Those conclusory allegations can't provide the "objective evidence" required to rely on *Gonzalez*'s narrow exception to the probable cause requirement. *See Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) ("[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim must plead and prove the absence of probable cause for the arrest. At the same time, we [have] recognized a narrow exception to that rule. The existence of probable cause does not defeat a plaintiff's claim if he produces objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." (quotation cleaned up)).

defense.  The court thus dismisses plaintiff's retaliatory arrest claim against the officer

defendants.  Qualified immunity bars the claim.

### D.    Failure to Intervene

Plaintiff also brings a claim for failure to intervene.  Doc. 1 at 53–54 (Compl. ¶¶ 211–

22).  He contends that the officer defendants' failure to prevent his unlawful arrest violated his

Fourth Amendment right to freedom from unreasonable search and seizure.  *Id.* at 54 (Compl.

¶¶ 219–22).  Specifically, he asserts that at "any time during the interaction with [p]laintiff or the

subsequent booking process, [d]efendant McShane had the opportunity to intervene in use of

force and booking of plaintiff but failed to do so."  *Id.* at (Compl. ¶ 220).  He also contends that

"Twite, Foster, and Shipley had the opportunity to intervene in [d]efendant McShane's unlawful

arrest of plaintiff but failed to do so."  *Id.* (Compl. ¶ 219).  The court first recites the law for

stating a failure-to-intervene claim and then evaluates the claim against each group of officer

defendants—*first*, McShane, and *then* Twite, Foster, and Shipley.

"The Tenth Circuit has recognized 'that all law enforcement officials have an affirmative

duty to intervene to protect the constitutional rights of citizens from infringement by other law

enforcement officers in their presence.'"  *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022)

(quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).  "A plaintiff

states a constitutional violation in the form of failure to intervene by alleging that 1) a

government officer violated his constitutional rights, 2) a different government actor (the

defendant) observed or had reasons to know about that constitutional violation, and 3) the

defendant had a realistic opportunity to intervene, but failed to do so."  *Id.*  "Those elements

draw a distinction between the violating officer and the observing officer, and the latter is subject

to liability for a failure-to-intervene claim."  *Spiehs v. Armbrister*, No. 24-4005-JAR-BGS, 2025

WL 548423, at *11 (D. Kan. Feb. 19, 2025).

The officer defendants identify two shortcomings with plaintiff's failure-to-intervene claim that, the officers assert, preclude him from clearing the first qualified immunity hurdle. Doc. 32 at 11–13. *First*, the officer defendants argue that plaintiff's failure-to-intervene claim against McShane "make[s] little sense" because plaintiff "seemingly argues that [d]efendant McShane should have intervened to stop his own actions." *Id.* at 12. The court agrees. As *Spiehs* clarified, the elements of a failure-to-intervene claim confer liability on "the observing officer," not "the violating officer[.]" 2025 WL 548423, at *11. Here, McShane is one of the "violating" officers. He was involved actively in plaintiff's arrest and the alleged use of excessive force. *See* Doc. 1 at 40–41 (Compl. ¶ 153). So, a failure-to-intervene claim doesn't lie against McShane.

*Second*, the officer defendants argue that there's no underlying constitutional violation to support a failure-to-intervene claim against Twite, Foster, and Shipley because the arrest wasn't unlawful.[3] Doc. 32 at 12. The court again agrees with defendants. "An unlawful arrest occurs when there is no probable cause to support the arrest." *Spiehs*, 2025 WL 548423, at *10 (citation omitted). And, the Supreme Court has recognized, a "warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). As outlined at length above, probable cause for the crime of interference supported plaintiff's arrest here. *See* § III.C. Plaintiff thus fails to establish the

---

[3]    To the extent that plaintiff intended to premise his claim against Twite, Foster, and Shipley on their failure to intervene in the use of excessive force, the same two barriers also prohibit that putative claim's success. *First*, the Complaint's allegations don't specify which officer defendants allegedly used excessive force. *See* § II, n.1, above. So, any or all of these three officers could assume the role of violating officer. A plaintiff may direct a failure-to-intervene claim only against an observing officer, not a violating officer. *Second*, even if some or all of these officers were the observing officers, no allegations establish that the use of force was excessive, so no constitutional violation satisfies the first failure-to-intervene element. *See* § III.E, below.

90

AA181

constitutional violation required to support a viable failure-to-intervene claim.  *See Bledsoe*, 53

F.4th at 616 (reciting "a government officer violated his constitutional rights" as the first

element).  So, plaintiff's failure-to-intervene claim fails.  As before, plaintiff fails to sustain his

burden in the face of a qualified immunity defense on the first prong.  Qualified immunity bars

this claim, as well, and the court dismisses it against all officer defendants.  Now, the court

moves on to plaintiff's third claim.

### E.    Excessive Force

Plaintiff asserts excessive force under two alternative theories—one applies if probable

cause didn't support plaintiff's arrest, and one applies even if it did.  Doc. 1 at 55 (Compl.

¶¶ 225–28).  Because the court already determined probable cause supported plaintiff's arrest,

*see* § III.C., the court only need consider the second theory.  Under that theory, plaintiff contends

that "the force was not reasonably proportionate to the need for that force given the totality of the

circumstances facing the defendant Officers[.]"  Doc. 1 at 55 (Compl. ¶ 229).  Plaintiff alleges

the force included "the unwarranted aggressive grabbing of [plaintiff's] arms, pain pressure

maneuvers, and twisting of fingers" accompanied by restraining plaintiff and restricting his

movement.  *Id.* at 56 (Compl. ¶ 231).  And this use of force, plaintiff contends, deprived him of

his constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.[4]  *Id.* at 58

(Compl. ¶¶ 244, 246).

---

[4]    The officer defendants argue that the court need consider plaintiff's excessive force claim solely
under the Fourth Amendment here.  Doc. 32 at 13.  That's so, the officer defendants contend, because
courts analyze excessive force claims arising in the context of an arrest—like here—strictly under the
Fourth Amendment.  *Id.* (citing *Estate of Holmes ex rel. Couser v. Somers*, 387 F. Supp. 3d 1233, 1249
(D. Kan. 2019)).  Courts reserve excessive force analyses under the other named Amendments for other
contexts, the officer defendants assert.  *See id.* (explaining Fourteenth Amendment claims apply to
pretrial detainees (quoting *Estate of Holmes*, 387 F. Supp. 3d at 1249)); *id.* (noting Eighth Amendment
claims apply solely to convicted prisoners (citing *Byers v. Smith*, No. 20-cv-03107-HLT, 2020 WL
6077420, at *2 (D. Kan. Oct. 15, 2020))); *id.* (asserting Fifth Amendment only applies to actions taken by
federal government (citing *Williams v. Bd. Cnty. Comm'rs*, No. 06-2055-KHV, 2006 WL 2385342, at *3
(D. Kan. Aug. 17, 2006))).  Plaintiff never responds to this argument.  *See generally* Doc. 34.  The court

AA182

A claim that law enforcement officers have used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017); *Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (further citation and internal quotation marks omitted)). When performing this analysis, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The *Graham* test asks if the officers' actions were objectively reasonable and recognizes that officers need to make split-second judgments. A small amount of force, like grabbing a suspect and placing him in the patrol car, is permissible in effectuating an arrest under the Fourth Amendment." *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020) (quotation cleaned up). And "a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc). "The Tenth Circuit has recognized that the absence of a serious injury is relevant to the excessive force analysis, and that the extent of the injury 'may . . . provide some indication of the amount

---

agrees with the officer defendants. *See Porro v. Barnes*, 624 F.3d 1322, 1325–26 (10th Cir. 2010) (outlining which amendment applies to excessive force claim based on "where the defendant finds himself in the criminal justice system" and concluding Fourth Amendment "pertains to the events leading up to and including an arrest of a citizen previously at liberty"). The court thus dismisses plaintiff's claims based on the Fifth, Eighth, and Fourteenth Amendments and considers here excessive force solely under the Fourth Amendment.

AA182

of force applied.'"  *McGregor v. City of Neodesha*, No. 22-1033-EFM, 2022 WL 6728149, at *5 (D. Kan. Oct. 11, 2022) (ellipses in original) (quoting *Marshall v. Milyard*, 415 F. App'x 850, 853 (10th Cir. 2011)).  De minimus force includes that which is "limited, temporary, and left no substantial injury."  *Id.*  In *Valencia v. De Luca*, the Tenth Circuit agreed with the district court's analysis that "pulling on [plaintiff], using pressure points, and twisting his wrist and arm" was reasonable force, even though plaintiff there was a minor.  612 F. App'x 512, 519 (10th Cir. 2015).  In reaching that conclusion, our Circuit noted that "the amount of force used was minimal in comparison with more drastic techniques, such as the use of pepper spray, tasers, or batons[.]"  *Id.*

Here, the amount of force plaintiff alleges was reasonable under *Graham*'s standard.  To be sure, the *Graham* test suggests minimal force is appropriate in these circumstances.  Plaintiff alleges that he was unarmed and didn't engage in hostile actions toward the officers.  Doc. 1 at 56 (Compl. ¶¶ 232–33).  Indeed, he tried to move away from McShane.  Doc. 1 at 28 (Compl. ¶ 111).  Plaintiff also argues that there "is no evidence that [he] actively resisted arrest.  He never attempted to flee."  Doc. 34 at 13.  Naturally, the court is cognizant of the inherent danger to officers given the active shooter situation, which plaintiff arguably compounded with his alleged interference.  And plaintiff was charged with a felony, not a misdemeanor.  *See Donahue*, 948 F.3d at 1197 (finding first *Graham* factor favors minimal force when "crimes at issue were misdemeanors").  Under Kan. Stat. Ann. § 21-5904(b)(5)(A), interference is a severity level 9, nonperson felony.  So, on the whole, the *Graham* factors suggest some minimal force is reasonable.

Even the force alleged in the Complaint is minimal.  He alleges the officer defendants used "body and neck restraints, bending of the wrists and twisting of" plaintiff's fingers while

arresting him.  Doc. 1 at 39 (Compl. ¶ 149).  But plaintiff provides no facts supporting a finding

of any injury other than a de minimus one.  *See generally* Doc. 1; *see also Marshall*, 415 F.

App'x at 854 ("[A]llegations of de minimus force simply fall short of what is required to

establish a constitutional violation.").  Recall, too, that a "small amount of force . . . is

permissible" when "effectuating an arrest."  *Donahue*, 948 F.3d at 1196 (quotation cleaned up).

The amount of force plaintiff alleges falls into the permissible category.  *See, e.g.*, *Donahue*, 948

F.3d at 1197 (finding one officer pulling arrestee up and two officers pulling arrestee's arms

back and handcuffing him constituted minimal force); *Valencia*, 612 F. App'x at 519

(concluding pulling, pressure points, and twisting were reasonable force); *McGregor*, 2022 WL

6728149, at *5 (finding "limited, temporary" force that "left no substantial injury" didn't support

constitutional violation).  The court thus concludes the force plaintiff alleges didn't exceed what

is reasonable to effectuate a lawful arrest under the circumstances plaintiff alleges here.

Plaintiff's excessive force claim thus falls short of what the law requires.  And without

sufficient allegations to allege a constitutional violation, plaintiff fails to shoulder his qualified-

immunity burden at the first prong.  So, the court holds, qualified immunity bars plaintiff's

excessive force claim and the court dismisses it against all officer defendants.

### F.    Malicious Prosecution under 42 U.S.C. § 1983

Finally, plaintiff brings a claim for malicious prosecution under § 1983 against the officer

defendants.  But, the officer defendants argue, the court needn't engage in a detailed analysis of

this claim.  Doc. 32 at 16.  That's so because plaintiff can't meet the second element required for

such a claim—a favorable outcome for plaintiff in the underlying action.  *Id.*  Plaintiff never

responds to this argument.  *See generally* Doc. 34.

"A malicious prosecution claim brought under the Fourth Amendment requires a showing

that (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the

**94**                                                                    **AA185**

original action terminated in favor of the plaintiff; (3) no probable cause supported the original

arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the

plaintiff sustained damages." *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014)

(internal quotation marks and citation omitted).

 Here, both the copy of the state court criminal docket attached to the officer defendants'

motion, Doc. 32-2 at 1 (Ex. B),[5] and the court's independent research confirm that plaintiff's

criminal case for felony interference with law enforcement remains pending, *see* Kansas District

Court Access Portal, https://prodportal.kscourts.gov/ProdPortal/ (last visited Mar. 22, 2025)

(showing plaintiff's state court criminal case, DG-2023-CR-000525, remains "pending").

Plaintiff thus can't satisfy the favorable result element of a malicious prosecution claim.  This

failure means that plaintiff didn't overcome the first prong to challenge the officer defendants'

qualified immunity defense, once again.  And the court dismisses plaintiff's malicious

prosecution claim against all officer defendants as barred by qualified immunity.

 Because the court dismisses all claims asserted against all officer defendants, it needn't

reach defendants' arguments about fair notice.  *See* Doc. 32 at 4.  It does, however, have one

final issue to evaluate before moving to the city's Motion to Dismiss:  attorneys' fees.

---

[5] In considering the officer defendants' motion, the court can consider documents subject to
judicial notice.  The officer defendants ask this court to take judicial notice of plaintiff's state court
criminal docket, a copy of which they attach as an exhibit.  *See* Doc. 32-2 (Ex. B).  The court properly can
take judicial notice of these proceedings.  *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*,
605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of
proceedings in other courts, both within and without the federal judicial system, if those proceedings have
a direct relation to matters at issue."); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts
subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to
dismiss into a motion for summary judgment." (citation omitted)).

**94**                                     24                              **AA185**

G.    **Attorneys' Fees**

The officer defendants request an award of attorneys' fees under 42. U.S.C. § 1988.  Doc. 32 at 19; Doc. 39 at 9.  Plaintiff never responds to this request.  *See generally* Doc. 34.

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses."  *Fox v. Vice*, 563 U.S. 826, 832 (2011).  The officer defendants invoke 42 U.S.C. § 1988(b), which allows the award of "a reasonable attorney's fee" to "the prevailing party" in a § 1983 suit.  When the defendant prevails, "§ 1988 authorizes a district court to award attorney's fees to a defendant 'upon a finding that the plaintiff[s'] action was frivolous, unreasonable, or without foundation.'" *Fox*, 563 U.S. at 833 (quoting *Christiansburg Garmet Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

The officer defendants never argue—much less establish—that plaintiff's action was frivolous, unreasonable, or without foundation.  *See generally* Doc. 32; *see generally* Doc. 39. Nor is it evident that defendants have complied with D. Kan. Rule 54.2, which provides the procedural framework for requesting attorneys' fees in our court.  So, the court denies the officer defendants' request for costs and attorneys' fees under § 1988.  Doc. 32 at 19; Doc. 39 at 9.

Having wrapped up plaintiff's claims against the officer defendants, the court turns next to plaintiff's claims against the City Commission of Lawrence, and the city's dismissal arguments.

IV.    **The City's Motion to Dismiss (Doc. 7)**

Plaintiff also asserts claims against the City Commission of Lawrence—based on the same felony arrest event—under 42 U.S.C. § 1983.  Recall that § 1983 "requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law."  *Fowler*, 104 F.4th at 797 (internal quotation marks and citation omitted).  Plaintiff contends that the city deprived him of his First Amendment right to "photograph, to record matters of public interest, observe

**96**     **AA187**

governmental operations, and even the commission of a crime." Doc. 1 at 47 (Compl. ¶ 178)

(citing *Project Veritas v. Schmidt*, 72 F.4th 1043, 1065 (9th Cir. 2023)). Also, he argues the

Lawrence Police Department (LPD)'s policy addressing recording police activities amounts to a

prior restraint on speech. *Id.* (Compl. ¶ 181). He also alleges that the policy is retaliatory

because officer defendants singled him out to chill his speech. *Id.* at 50 (Compl. ¶ 191). Finally,

plaintiff asserts that the city failed to train and supervise its police officers. *Id.* at 60 (Compl.)

(Count VI). Because any attempt to assert liability against a municipality necessarily starts with

*Monell*, the court explains it, next.

### A.     Municipal Liability under *Monell*

A plaintiff may not assert a 42 U.S.C. § 1983 claim against a municipal entity unless he

establishes that a government policy or custom caused his injuries. *See Monell v. Dep't of Soc.

Servs. of City of N.Y.*, 436 U.S. 658 (1978). Municipal liability is limited to those situations

"when execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.*

at 694. To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of

a municipal policy or custom, and 2) that there is a direct causal link between the policy or

custom and the injury alleged.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir.

2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). A plaintiff may

establish such municipal policy or custom by alleging facts capable of demonstrating one of the

following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or usage
> with the force of law; (3) the decisions of employees with final policymaking
> authority; (4) the ratification by such final policymakers of the decisions—and the
> basis for them—of subordinates to whom authority was delegated subject to these
> policymakers' review and approval; or (5) the failure to adequately train or

**96**     **AA187**

supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted).  To survive a motion to dismiss, a plaintiff "must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation."  *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (citation omitted).

Here, plaintiff invokes the first (formal regulation or policy statement) and fifth (failure to train adequately) bases for imposing *Monell* liability.  Under the first, plaintiff recites a formal LPD policy and contends it amounts to prior restraint and a retaliatory policy.  Under the fifth, plaintiff recounts alleged failures of the officer defendants at the scene of his felony arrest and argues those failures arose from inadequate training or supervision.  The court begins by analyzing the LPD's formal policy.

**B.    Prior Restraint and Retaliatory Policy**

The Complaint invokes LPD policy to allege *Monell* liability in two ways:  prior restraint and retaliatory policy.[6]  Take them in turn.

*First*, plaintiff alleges that the LPD's policy is a form of prior restraint.  Doc. 1 at 47 (Compl. ¶ 181).  "Generally, a prior restraint restricts speech in advance on the basis of content and carries a presumption of unconstitutionality."  *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (quotation cleaned up).  "In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of

---

[6]    The Complaint also alleges that the city's failure to take remedial action after a constitutional violation allows the court to infer a policy or custom supporting *Monell* liability.  Doc. 1 at 50 (Compl. ¶¶ 195–96).  Given that the court has concluded no constitutional violation occurred, it needn't reach this theory of municipal liability.

**98**                                                        **AA189**

contempt." *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1193 (D.N.M. 2024)

(internal quotation marks and citation omitted). "[A]n administrative licensing

scheme . . . . requires a speaker to obtain approval before engaging in certain forms of speech in

a given forum . . . . A typical example . . . required citizens to obtain a permit before holding a

parade or assembly on public property." *Taylor*, 713 F.3d at 42 (citation omitted). "A judicial

injunction is usually a court order forbidding specific speakers from specific expression." *Id.*  In

evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged

provisions of the injunction burden no more speech than necessary to serve a significant

government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Here, the Complaint recites the following LPD policy, and plaintiff asserts his prior

restraint and retaliatory policy claims on it:

> Members of the public who wish to record law enforcement activities are limited
> only in certain aspects.
> (a) Recordings may be made from any public place or any private property where
> the individual has the legal right to be present.
> (b) Beyond the act of photographing or recording, individuals may not interfere
> with the law enforcement activity.  Examples of interference include, but are not
> limited to:
>> 1. Tampering with a witness or suspect.
>> 2. Inciting others to violate the law.
>> 3. Being so close to the activity as to present a clear safety hazard to the
>> officers.
>> 4. Being so close to the activity as to interfere with an officer's effective
>> communication with a suspect or witness.
> (c) The individual may not present an undue safety risk to the officer, him/herself
> or others.

Doc. 1 at 48 (Compl. ¶ 183) (quoting Lawrence Police Department Policy Manual 425.3).  This

policy doesn't match either of the prior restraint "classic forms:  judicial injunctions and

administrative licensing schemes." *Taylor*, 713 F.3d at 42.  The policy isn't directed at an

individual, like a judicial injunction, *id.*, and it doesn't require pre-approval by a permit or

license, *Voter Reference Found.*, 727 F. Supp. 3d at 1193. Nor does it restrict speech based on its content. *Taylor*, 713 F.3d at 42. These considerations alone suggest plaintiff can't state a prior restraint claim based on the LPD policy. But, even if it qualifies as a prior restraint, it would survive the constitutionality test, as explained next.

Plaintiff alleges that the City Commission of Lawrence, through this policy, "empowers its officers to engage in limiting First Amendment conduct simply because the citizen is recording." Doc. 1 at 48 (Compl. ¶ 182). The city responds that the right to record isn't absolute and argues the restrictions are reasonable. Doc. 8 at 8. Recall that the right to film police while they're performing their duties is subject to time, place, and manner restrictions. *Irizarry*, 38 F.4th at 1292 n.10. And the appropriateness of those time, place, and manner restrictions turns largely on whether an individual "interfere[s] with the police officers' performance of their duties," *id.* (quotation cleaned up), and whether the filming occurs "from a comfortable remove," *Glik*, 655 F.3d at 84 (quotation cleaned up). "It is well-settled that even in a public forum the government may impose reasonable restrictions on the time, place, and manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information." *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1070 (10th Cir. 2020) (internal quotation marks and citations omitted).

Here, the policy at issue aligns with reasonable restrictions, as the city argues. Doc. 8 at 8. For example, it prohibits the recorder from interfering and lingering "so close to the activity as to present a clear safety hazard[.]" Doc. 1 at 48 (Compl. ¶ 183). An officer's ability to complete his duties without interference and maintain safety is significant enough to justify the

restrictions. *See McCraw*, 973 F.3d at 1070. What's more, the policy limits recording "only in certain aspects." Doc. 1 at 48 (Compl. ¶ 183). Such narrow tailoring also suggests the policy's restrictions are reasonable.

The court thus concludes plaintiff fails to state a § 1983 claim against the city premised on prior restraint. Plaintiff hasn't alleged plausibly that the LPD policy is a prior restraint. And, even if it were, plaintiff hasn't alleged plausibly that it serves as a "direct causal link between the policy . . . and the injury[.]" *Bryson*, 627 F.3d at 788 (quotation cleaned up). Execution of LPD's recording policy doesn't inflict the "injury alleged" because the policy only imposes reasonable—not unconstitutional—restrictions. *Id.*

*Second*, plaintiff argues that the LPD policy is retaliatory because the officer defendants singled him out due to his recording. Doc. 1 at 50 (Compl. ¶¶ 191, 193). Meanwhile, the Complaint alleges officer defendants allowed other individuals to remain on the property. *Id.* (Compl. ¶ 193). So, plaintiff alleges, the officer defendants used the policy as a way "to retaliate and chill [plaintiff's] speech." *Id.* (Compl. ¶ 191). But these are conclusory allegations, as explained below. And even if they weren't, they don't support a retaliatory policy allegation. "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018). Here, plaintiff alleges no more than an on-the-spot officer's decision, rather than a "long term and pervasive" retaliation against individuals who record police activity. *Id.*

Also, plaintiff's allegations about other individuals on the property are conclusory. Recall that probable cause supported plaintiff's arrest because he ignored law enforcement instructions and distracted them by presenting additional safety concerns. To demonstrate

retaliation, plaintiff must allege that the other individuals on the scene were acting in a fashion similar to him.  But here plaintiff never alleges that any other individuals ignored law enforcement's instructions.  Nor does he allege anything about the proximity of other individuals to the active shooter's residence.  He doesn't even allege that these other individuals *weren't* filming on their cell phones.  He simply says that "defendants allowed other individuals to be present on the same private property."  Doc. 1 at 50 (Compl. ¶ 193).  That allegation just doesn't cut it.

The court concludes plaintiff's allegation of a § 1983 claim premised on retaliatory policy likewise fails to state a claim.  Plaintiff hasn't alleged a "long term and pervasive" retaliatory approach.  *Lozman*, 585 U.S. at 100.  Nor has plaintiff alleged "sufficient facts to show that" LPD's policy—and not plaintiff's criminal interference—was "the moving force behind the alleged violation."  *Dalcour*, 492 F. App'x at 930 (citation omitted).

### C.    Failure to Train and Supervise

Finally, plaintiff alleges the city is liable under *Monell* because it failed to train and supervise.  Doc. 1 at 60–67 (Compl. ¶¶ 256–89).  To invoke this method of demonstrating municipal policy or custom, a plaintiff must show either "a pattern of prior similar misconduct" or that the need for training was "so obvious" and the current training's inadequacy "so likely to result in the violation of constitutional rights" that policymakers demonstrated deliberate indifference.  *Waller v. City and County of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019) (citation and internal quotation marks omitted).  Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and citations omitted).  And, while "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

government policy[,]" this failure-to-train theory is the "most tenuous" theory which can support

municipal liability because it is "nebulous" and "removed from the constitutional violation." *Id.*

(internal quotation marks and citation omitted).

Here, plaintiff asserts a failure to train and supervise claim premised on the officer

defendants' alleged failure to

- de-escalate the situation, Doc. 1 at 61 (Compl. ¶ 260),

- handle plaintiff's presence at the scene properly, *id.* at 62–63 (Compl. ¶ 267),

- communicate with plaintiff, *id.*,

- communicate with the command structure, *id.* at 63 (Compl. ¶ 271),

- secure the scene and establish a viable security perimeter, *id.* at 64 (Compl. ¶ 273), and

- protect plaintiff once detained, *id.*

But here's the problem.  Plaintiff never alleges "a pattern of prior similar misconduct[.]"

*Waller*, 932 F.3d at 1288 (citation and internal quotation marks omitted).  He focuses solely on

this single incident involving him.[7]  In short, he must allege facts to demonstrate deliberate

---

[7]    In his Response, plaintiff asserts that this "is not the first incident regarding the Lawrence Police Department policies of arrest and excessive use of force."  Doc. 19 at 8.  To support this assertion, however, plaintiff first refers to an ongoing case—brought by plaintiff's counsel here—which has pending motions to dismiss for failure to state a claim and which is under a stay of discovery.  *Id.* (citing *Anthony v. Ashley et al.*, No. 24-cv-4034-JWB-BGS (D. Kan. 2024)); *see also Kennon v. Ashley*, No. 24-4034-JWB-BGS, 2024 WL 4826901, at *3 (D. Kan. Nov. 19, 2024) (staying discovery pending ruling on motions to dismiss).  That's not evidence of a pattern—that's merely evidence of allegations in another case plaintiff's counsel is working on currently.  Then, plaintiff refers to *Calvo-Pino v. Weidl*, presumably to encourage the court to "stack inference upon inference" to show the city's unconstitutional practice. Doc. 19 at 8 (quoting *Calvo-Pino v. Weidl*, 514 F. Supp. 3d 1321, 1327 (D. Kan. 2021)).  But the allegations here, the court has concluded, fail to state a constitutional violation.  So, inference stacking isn't appropriate here.  And to the extent plaintiff intended *Calvo-Pino* to support evidence of a pattern, it doesn't.  *Calvo-Pino* involved the Lawrence Police Department, but relies on categorically different allegations of prolonging traffic stops in violation of the Fourth Amendment.  514 F. Supp. 3d at 1329. And the court there found no pattern of similar misconduct.  *Id.*  Even if these cases offered some support for plaintiff's assertion of a pattern, plaintiff didn't include any such allegations in his Complaint here. *See generally* Doc. 1.  So, the court evaluates plaintiff's claim under a deliberate indifference standard.

indifference. But, as the city notes, he hasn't. Doc. 8 at 14. He alleges no facts to suggest that the city "disregarded a known or obvious consequence of [its] action." *Connick*, 563 U.S. at 61 (internal quotation marks and citations omitted). Plaintiff doesn't allege anything about the city's training program or supervisory approach. There are no allegations that the city has engaged in a pattern of handling individuals recording police activities improperly. Indeed, plaintiff's response to this argument is telling. Plaintiff copied and pasted pages of allegations from his Complaint that, he asserts, support his failure-to-train claim. Doc. 19 at 3–5. But all those allegations come from the incident involving him, on May 20, 2023. *Id.* None of the identified allegations allege anything about the city or its training of officers except for that one day. *Id.* And, when he explains what the city failed to train, he repeatedly suggests the paucity of training is "evidenced . . . by defendant McShane." *Id.* at 5–6. Plaintiff simply identifies one incident—focusing mainly on one officer defendant—and then asks the court to assume any failures by McShane on that day demonstrate indifference. But the deliberate indifference standard is "stringent." *Connick*, 563 U.S. at 61. And identifying just one incident—without any other supporting allegations—just isn't enough to survive on this "tenuous" theory of liability. *Id.*

The court thus dismisses plaintiff's § 1983 claim premised on a failure to train or supervise. Given this conclusion, the court's work is done and it needn't reach the city's arguments about Rule 8. *See* Doc. 8 at 5.

**V.        Conclusion**

Plaintiff failed to shoulder his burden—in response to the officer defendants' qualified immunity defense—to show that a constitutional violation occurred. And so, qualified immunity bars all four claims against the officer defendants, and the court dismisses them without

104     AA195

prejudice.  Plaintiff also failed to state a § 1983 claim against the city under either *Monell*

liability theory.  The court thus dismisses these claims, as well, without prejudice.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants David

McShane, Meagan Shipley, Grant Foster, and Austin Twite's Motion to Dismiss (Doc. 31) is

granted.  Defendants David McShane, Meagan Shipley, Grant Foster, and Austin Twite's request

for attorneys' costs and fees is denied.

**IT IS FURTHER ORDERED THAT** defendant City Commission of Lawrence,

Kansas's Motion to Dismiss (Doc. 7) is granted.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court shall enter judgment

consistent with this Order.

**IT IS SO ORDERED.**

**Dated this 26th day of March, 2025, at Kansas City, Kansas.**

                              **s/ Daniel D. Crabtree**
                              **Daniel D. Crabtree**
                              **United States District Judge**

104     AA195

105 AA196

# United States District Court

------------------------ DISTRICT OF KANSAS --------------------------

PHILLIP MICHAEL ERAVI,

        **Plaintiff,**

v.                                 **Case No. 24-4042-DDC-RES**

CITY COMMISSION OF
LAWRENCE, KANSAS,
MEAGAN SHIPLEY,
AUSTIN TWITE,
GRANT FOSTER,
DAVID MCSHANE,

        **Defendants.**

## JUDGMENT IN A CIVIL CASE

☐    Jury Verdict.  This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒    Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

**Plaintiff shall take nothing and this action is dismissed consistent with the Memorandum and Order (Doc. 41) filed on March 26, 2025.**

    03/26/2025                    SKYLER B. O'HARA
       Date                         CLERK OF THE DISTRICT COURT

                                         by:   s/ Megan Garrett
                                            Deputy Clerk

105 AA196